94 P.3d 667

**Curtis SIMMONS; Cheryl Simmons, Plaintiffs–Appellants,**

**v.**

**Wanda PUU; Gary Puu; Hertz Corporation, Defendants–Appellees,**

**John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Governmental Entities 1–10; Roe Non-profit Corporations and/or Other Entities 1–10, Defendants.**

**No. 23714.**

Supreme Court of Hawai'i.

July 23, 2004.

Christopher F. Carroll, Wailuku, On the briefs, for the plaintiff-appellant Curtis Simmons.

Glenn I. Kimura, Hilo, and John S. Mukai, Honolulu, of Char, Hamilton Campbell & Thom, On the briefs, for the defendants-appellees The Hertz Corporation, Gary Puu.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiff-appellant Curtis Simmons [hereinafter, "Curtis"] appeals from the final judgment of the second circuit court, the Honorable Shackley F. Raffetto presiding, filed on August 2, 2000.[1]

---

1. As discussed *infra* in section I, although the plaintiff Cheryl Simmons was one of the parties in the circuit court, her claims were resolved by settlement and stipulation for dismissal with prejudice as to the defendants Gary Puu and the Hertz Corporation, filed on October 24, 1996. Moreover, on December 26, 1996, the circuit court filed its final order of dismissal, dismissing Curtis's claims as to the defendant Wanda Puu for lack of service; the foregoing order was supplemented by another final order of dismissal, filed on July 22, 1998. Thus, neither Cheryl nor Wanda are parties to the present appeal.

Curtis's sole contention on appeal is that the circuit court erred in entering a January 18, 2000 order granting the motion of the defendants-appellees Gary Puu [hereinafter, "Gary"] and the Hertz Corporation [hereinafter, "Hertz"] [collectively hereinafter, "the Appellees"] for partial summary judgment regarding unfair claims settlement practices, filed on October 15, 1999. More specifically, Curtis argues (1) that, as a matter of public policy and as a logical extension of existing Hawaiʻi law, self-insurers can be liable in tort to third-party claimants [2] for bad faith settlement practices and (2) that there was a genuine issue of material fact as to whether the Appellees had dealt with him in bad faith, inasmuch as Curtis alleges that Hertz:

> (a) compelled [him] to institute ... Small Claims Court litigation to recover amounts acknowledged by [a] Hertz claims adjuster to be legitimately due for property damage; (b) failed to promptly settle [his] property damage claim, where liability was self-evident, in order to gain an advantage as to [his] personal injury claim; (c) refused to pay claims shown to be valid based on available information; (d) failed to provide a written reasonable explanation for its delay; (e) did not attempt in good faith to effectuate prompt, fair, and equitable settlements of claims where liability was self-evident; and (f) did not provide a

reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the personal injury claim.

Curtis also maintains that, even assuming *arguendo* that Hertz acted in good faith reliance upon a legal defense in refusing to settle his *personal injury* claim, Hertz relied on no such defense in failing to process his *property damage* claim in good faith, such that the circuit court erred in granting summary judgment in favor of the Appellees. The Appellees respond that the circuit court did not err in granting summary judgment in their favor, inasmuch as: (1) Hertz is not an insurer and does not have a claims practice, such that Curtis is not a third-party beneficiary with standing to sue Hertz for the tort of bad faith settlement practices; (2) a claim of bad faith settlement practices fails in the present circumstances as a matter of law because (a) Hertz is not bound by an obligation to pay Curtis and, even assuming that Hertz "improperly" withheld insurance payments from Curtis, (b) reasonable reliance upon an unsettled question of law or legal defense to liability does not constitute bad faith; and (3) Curtis has no statutory bad faith claim for relief based upon Hawaiʻi Revised Statutes (HRS) §§ 480–2 (1993) [3] and 480–13 (1993).[4]

**2.** In *Best Place, Inc. v. Penn America Ins. Co.*, 82 Hawaiʻi 120, 920 P.2d 334 (1996), this court explained the distinction between "third-party" and "first-party" claims as follows:

> A "third-party claim" is one where the insurer contracts to defend the insured against claims made by third parties against the insured and to pay any resulting liability, up to the specified dollar limit. In contrast, a "first-party claim" refers to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured.

82 Hawaiʻi at 124 n. 4, 920 P.2d at 338 n. 4.

**3.** HRS § 480–2 provided:

> **Unfair competition, practices, declared unlawful.** (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
> (b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section

5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.
> (c) No showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of the Federal Trade Commission Act) is necessary in any action brought under this section.
> (d) No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

Effective June 28, 2002, the legislature amended HRS § 480–2 in respects not relevant to the present matter. *See* 2002 Haw. Sess. L. Act 229, § 2 at 916–17.

**4.** HRS § 480–13 provided in relevant part:

> (b) Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480–2:
> (1) May sue for damages sustained by the consumer, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not

For the reasons discussed *infra* in section III, we hold that there is no common law tort claim of bad faith settlement practices available to third-party claimants to bring suit against self-insurers. Accordingly, we affirm the final judgment of the circuit court, filed on August 2, 2000, as to all claims and parties.

### I. *BACKGROUND:*

The present matter arises out of an April 16, 1992 motor vehicle accident involving a vehicle operated by Curtis and occupied by the plaintiff Cheryl Simmons [hereinafter, "Cheryl"] [collectively hereinafter, "the Appellants"] and a vehicle operated by the defendant Wanda Puu [hereinafter, "Wanda"] on Pi'ilani Highway in Kīhei, Maui. *See supra* note 1. Hertz owned, maintained, and self-insured the vehicle operated by Wanda, who was the lawful spouse of Gary, the manager of the Maui branch of Hertz "rent-a-car" at the time of the accident.

On May 7, 1992, the Appellants tendered a notice of claim for property damage and personal injuries to Acclamation Insurance Management Services [hereinafter, "AIMS"], an adjusting agency retained by Hertz. In late May 1992, a representative of AIMS orally responded to the Appellants' claim, stating that "Hertz may deny liability on the grounds that Wanda was not an authorized driver of the Hertz vehicle" and that "Hertz had not yet made a coverage decision with regard to the accident." Hertz's written policy governing the use of its cars by a manager's spouse reflected that Wanda's operation of the vehicle was not authorized, inasmuch as a manager's spouse was banned from using a Hertz car except (1) on vacation or days off when the manager was present or (2) occasionally for convenience (*e.g.*, if a Hertz

car was parked behind the family vehicle, thereby obstructing its movement), and neither of the foregoing exceptions applied to the circumstances of the accident.

On September 14, 1992, Curtis filed an action—Civil No. SCW92–245—against Hertz in the small claims division of the district court of the second circuit. Curtis sought $1,985.80 in damages for rental car, towing, and storage expenses resulting from the accident. By letter dated October 2, 1992, Hertz, through its AIMS adjuster, requested that Curtis dismiss the small claims action because the presiding judge in the small claims court had advised Curtis that the action risked preclusion from pursuing his additional liability claims based on *res judicata.* By letter dated October 14, 1992, Curtis informed the AIMS adjuster that he would not dismiss his small claims action, although he ultimately did so as to Hertz and filed a second small claims action, Civil No. SCW92–377, against Wanda on December 24, 1992. Curtis again sought $1,985.80 for rental car, towing, and storage expenses, and the small claims court entered judgment in favor of Curtis on February 11, 1993. On April 16, 1993, Curtis filed an acknowledgment of the satisfaction of the judgment against Wanda.

On October 4, 1995, the Appellants filed a complaint in the circuit court of the second circuit against Wanda and the Appellees seeking recovery for personal injuries arising from the accident. The Appellants' original complaint alleged several theories of liability as to their personal injuries, none of which are relevant to the resolution of the present matter. *See infra* section III. On or about October 2, 1996, Hertz settled Cheryl's claim, and the circuit court entered a stipulation for dismissal with prejudice on October 24, 1996. *See supra* note 1. The circuit court entered a

---

less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys fees together with the costs of suit; and

(2) May bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorneys fees together with the cost of suit.

. . . .

(d) The remedies provided in this section are cumulative and may be brought in one action.

Effective July 15, 1998, the legislature amended HRS § 480–13 in respects not pertinent to the present matter. *See* 1998 Haw. Sess. L. Act 179, § 2 at 668–69. Effective May 2, 2001, the legislature further amended HRS § 480–13 in respects not relevant to the present matter. *See* 2001 Haw. Sess. L. Act 79, § 1 at 127. Effective June 28, 2002, the legislature again amended HRS § 480–13 in respects not germane to the present matter. *See* 2002 Haw. Sess. L. Act 229, § 3 at 917–18.

notice of dismissal as to Wanda on November 22, 1996 and a final order of dismissal on December 26, 1996. *See supra* note 1.

On March 24, 1997, the Appellees filed a motion for summary judgment [hereinafter, "MSJ I"] as to Curtis's personal injury claims. On May 19, 1997, the circuit court entered an order partially granting MSJ I on the issue of negligent entrustment and denying it without prejudice as to the remaining issues so that Curtis could conduct further discovery.

On October 10, 1997, the Appellees filed another motion for summary judgment [hereinafter, "MSJ II"], which challenged Curtis's marital relationship and *respondeat superior* theories of liability. On October 13, 1997, in his memorandum in opposition to MSJ II, Curtis asserted a claim of bad faith settlement practices against Hertz; prior to filing the memorandum, Curtis had not raised that issue.[5] On October 17, 1997, the circuit court conducted a hearing on MSJ II. After the circuit court orally granted MSJ II, Curtis orally moved to amend the pleadings to include his claim of bad faith settlement practices, and the circuit court instructed Curtis to file a motion to amend the pleadings.

On October 28, 1997, Curtis filed a motion to amend pleadings, asserting "a claim of bad faith settlement practices against Hertz as self-insurer of a vehicle negligently driven by Wanda that caused Curtis's personal injuries." On December 9, 1997, the circuit court entered an order granting Curtis's motion to amend pleadings. On December 12, 1997, Curtis filed his second amended complaint, adding Count III, which alleged, *inter alia,* as follows:

### COUNT THREE

. . . .

22. HERTZ, its agents, employees, contractors or any of them, engaged in unfair and deceptive acts and practices in the administration of [Curtis's] property damage and personal injury claims.

23. HERTZ, its agents, employees, contractors, or any of them failed to deal fairly and in good faith in the administration of [Curtis's] property damage and personal injury claims.

24. As a direct and legal result of . . . HERTZ's negligent, reckless acts, or omissions (and/or any of the Defendants herein), [Curtis] has suffered economic and psychological damages, including punitive damages.

On January 14, 1998, the circuit court entered an order granting the Appellees' MSJ II "on the issue of the liability of . . . Gary . . . and any related *respondeat superior* liability of . . . Hertz . . . for any of the actions of . . . Gary. . . ." The circuit court also ordered that "the argument as to any unfair settlement practice stated in . . . Curtis['s] . . . Memorandum Opposing [MSJ II] . . . stricken without prejudice to [Curtis's] Second Amended Complaint."

On January 22, 1999, Curtis filed a motion for partial summary judgment [hereinafter, "MSJ III], specifically regarding, *inter alia,* the following "material facts and issues": (1) that Hertz's Certificate of Self–Insurance, premised upon its "self-insurer agreement" with the State of Hawai'i, *see infra* section III.B, "was in effect at the time of the accident and evidenced compliance by Hertz with Hawai'i's basic no-fault insurance coverage requirements set forth in HRS § 431:10C–301 (requiring minimum liability coverage of $35,000 for bodily injury, $10,000 for property damage and $15,000 for no-fault benefits)"; and (2) that Hertz's "self-insurer agreement" required Hertz to pay on behalf of the operator of the self-insured vehicle any sums the operator may legally be obligated to pay for injury or damage to others arising out of the operation of the self-insured vehicle and required that Hertz comply with all requirements of the no-fault law and applicable regulations, directives or orders of the [Insurance] Commissioner, including those relating to processing any paying of claims.

---

**5.** The Appellants' complaint, filed on October 4, 1995, and their first amended complaint, filed on March 5, 1996, did not raise the claim of bad faith settlement practices. Moreover, Curtis's pretrial statement, filed on October 4, 1996, asserted no such claim.

On March 12, 1999, the circuit court entered an order partially granting MSJ III as to the foregoing issues.

On March 15, 1999, the Appellees filed a motion for partial summary judgment [hereinafter, "MSJ IV"] as to Count III of Curtis's second amended complaint, maintaining in their memorandum in support (1) that Hertz is not an insurer and has no insurance claims practices, (2) that Curtis may not assert a private claim for relief pursuant to HRS chapter 431, article 13,[6] and (3) that Curtis has no claim for relief under HRS §§ 480–2 and 480–13, *see supra* notes 3 and 4. On May 5, 1999, the circuit court conducted a hearing on MSJ IV, orally granting the motion as to any statutory claims of bad faith settlement practices and otherwise continuing the hearing to May 26, 1999 for the purpose of resolving Curtis's remaining common law claim of bad faith. On June 8, 1999, the circuit court entered an order partially granting MSJ IV as to any statutory claim of bad faith settlement practices that Curtis may have asserted against the Appellees.

On May 18, 1999, the Appellees filed two motions for partial summary judgment [hereinafter, "MSJs V & VI"] regarding (1) "lack of damages," alleging that Curtis "cannot establish the essential element of damages as a matter of law," and (2) "punitive damages," contending that "there is no genuine issue of material fact and [the Appellees] are entitled to judgment as a matter of law with respect to punitive damages." On July 26, 1999, the circuit court entered two orders partially granting and partially denying MSJs V & VI, specifically ruling that "damages that will be allowed are those related to the common law bad faith tort claim which may be proven by ... Curtis...."

On October 15, 1999, the Appellees filed yet another motion for partial summary judgment regarding Curtis's claim of bad faith settlement practices [hereinafter, "MSJ VII"]. On December 22, 1999, after additional briefing by both parties, the circuit court

conducted a hearing on MSJ VII and orally ruled in favor of the Appellees:

> THE COURT:....
>
> It looks like what happened was Hertz took the position, "Look, we have got a legal defense here based upon the splitting of cause of actions [ (*i.e.,* Curtis's decision to bring the small claims court action for property damage separately from the personal injury action in circuit court) ], so we are not going to pay," and the Plaintiff's position is that's bad faith under common law principles, and after thinking about this for a long time, I think that the issue of whether that is bad faith is susceptible to summary judgment, and I am going to find that there's no genuine issue of material fact regarding that, and that it was not bad faith to rely upon the legal defense, and I am going to grant the motion on that basis, but not on the splitting of the cause of action.
>
> ....
>
> THE COURT: ... I just didn't feel after thinking about this for a long time that ... taking a position based upon a legal position is bad faith.

On January 18, 2000, the circuit court entered a written order granting the Appellees' MSJ VII. On August 2, 2000, the circuit court entered final judgment as to all claims and parties. On August 31, 2000, Curtis timely filed a notice of appeal.

## II. *STANDARD OF REVIEW*

■ We review the circuit court's grant or denial of summary judgment *de novo. Hawai'i Community Federal Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

6. HRS § 431:13–101 (1993) provides:

**Purpose.** The purpose of this article is to regulate trade practice in the business of insurance in accordance with the intent of the Congress of the United States as expressed in the act of Congress of March 9, 1945 (Public Law

15, 79th Congress), by defining, or providing for the determination of, all acts, methods, and practices which constitute unfair methods of competition or unfair or deceptive acts or practices in this State, and by prohibiting the trade practices so defined or determined.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Kahale v. City and County of Honolulu,* 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (quoting *SCI Management Corp. v. Sims,* 101 Hawai'i 438, 445, 71 P.3d 389, 396 (2003) (quoting *Coon v. City and County of Honolulu,* 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002))).

## III. *DISCUSSION*

■ On appeal, Curtis argues, *inter alia,* that self-insurers can be liable in tort to third-party claimants for bad faith settlement practices, on the following grounds: (1) that *Budget Rent–A–Car Systems, Inc. v. Ricardo,* 85 Hawai'i 243, 942 P.2d 507 (1997), and *Alzharani v. Pacific Int'l Services Corp.,* 82 Hawai'i 466, 923 P.2d 408 (1996), suggest that, like insurers, self-insurers must "perform[ ] . . . the duties that arise from statutes and regulations applicable to . . . self-insurance"; (2) that *Colonial Penn Ins. Co. v. First Ins. Co. of Hawai'i, Ltd.,* 71 Haw. 42, 780 P.2d 1112 (1989), and *Best Place, Inc. v. Penn America Ins. Co.,* 82 Hawai'i 120, 920 P.2d 334 (1996), "are indications . . . that an injured claimant is entitled [under common law principles] to good faith in regard to claims against a third-party tortfeasor's insurer"; and (3) that Curtis was entitled to assert a bad faith claim for relief based on a third-party beneficiary theory because "Hertz's [self-insurer a]greement with the

State required that Curtis . . . be assured that Hertz as a self-insurer would fairly process and promptly pay his claims."

In response, the Appellees contend, *inter alia,* that there exists no common law claim for relief entitling third-party claimants to sue self-insurers for bad faith settlement practices, inasmuch as Hertz is not an insurer and has no claims practices, such that Curtis is not a third-party beneficiary with standing to sue Hertz for the tort of bad faith settlement practices. We agree with the Appellees.[7]

A. *The Common Law Tort Of Bad Faith Settlement Practices Only Arises Out Of A Contractual Relationship Between An Insurer And An Insured.*

1. *Requirement of underlying insurance contract*

In *Best Place,* this court held that "Hawai'i now recognizes a bad faith cause of action in the first-party insurance context[,]" reasoning as follows: "(1) there is case law in this jurisdiction, as well as various statutory provisions contemplating a cause of action for insurer bad faith; and (2) recognizing a bad faith cause of action would not contravene the legislative intent with respect to the remedies for insurer misconduct." 82 Hawai'i at 127, 920 P.2d at 341. More specifically, this court largely relied on contract law as fundamental to its adoption of the bad faith claim for relief:

Historically, the duty of good faith and fair dealing was implied in contracts with conditions of satisfaction, *e.g.,* a contract for the painting of a portrait or for the supply of materials. However, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement. *Comunale v. Traders & Gen. Ins. Co.,* 50 Cal.2d 654, 328 P.2d 198, 200 (1958); *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985); *Kerrigan v. City of Boston,* 361 Mass. 24, 278

7. Because we hold that a third-party claimant may not assert a common law tort claim for relief against a self-insurer for bad faith settle-ment practices, we do not address Curtis's remaining points of error.

N.E.2d 387, 393 (1972). *But see English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983) (concluding that there is no covenant of good faith and fair dealing implied in every contract).

In the insurance context, courts first recognized the duty of good faith and fair dealing where the issue was whether a liability insurer wrongfully refused to settle a third-party claim. The early case of *Brassil v. Maryland Casualty Co.,* 210 N.Y. 235, 104 N.E. 622 (1914), recognized the principle that the obligation of good faith and fair dealing underlies all written agreements and that a breach of this obligation is a breach of contract. In *Brassil,* the New York Court of Appeals stated:

> [T]here is a contractual obligation of universal force which underlies all written agreements. It is the obligation of good faith in carrying out what is written. . . .
>
> [The insured's] rights ... go deeper than the mere surface of the contract written for him [or her] by the [insurer]. Its stipulations imposed obligations based upon those principles of fair dealing which enter into every contract.

*Brassil,* 104 N.E. at 624. The court then held that the insurer breached its contractual obligation of good faith when it unreasonably failed to settle a third-party settlement offer. *Id.*

In *Hilker v. Western Automobile Ins. Co.,* 204 Wis. 1, 231 N.W. 257, 259–60 (1930), *aff'd on reh'g,* 204 Wis. 1, 235 N.W. 413 (1931), the Supreme Court of Wisconsin, citing *Brassil, supra,* set forth the following rationale for imposing liability upon an insurer who refused to settle a third-party claim within policy limits:

> In view of the fact that these contracts of insurance are prepared by the company and not prescribed by law, the tendency of the decisions has been to extend, rather than to circumscribe, the field of liability on the part of the company and to hold that the rights of the insured 'go deeper than the mere surface of the contract written for him by the defendant. Its stipulations imposed obligations based upon those principles

of fair dealing which enter into every contract.' *Brassil,* 104 N.E. at 624, L.R.A.1915A, 629, 632. The covenant of good faith and fair dealing, of course, is not limited to insurance contracts.

The cornerstone of the decisions in *Brassil* and *Hilker* is that, in every contract, there is an implied covenant of good faith and fair dealing.

> *The obligation to deal in good faith is now a well-established principle of contract law.* Restatement (Second) Contracts § 205 (1979) provides that "[e]very *contract* imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." In *Hawai'i Leasing v. Klein,* 5 Haw.App. 450, 456, 698 P.2d 309, 313 (1985), the Intermediate Court of Appeals (ICA) explicitly recognized that *parties to a contract* have a duty of good faith and fair dealing in performing contractual obligations. We also note that the *parties to all commercial contracts* in this jurisdiction are subject to a statutory duty to perform in good faith. *See* HRS § 490:1–203 (1993) (providing that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement.").
>
> *We now address the question of whether a breach of this duty in the insurance context gives rise to a bad faith cause of action.*

*Id.* at 123–25, 920 P.2d at 337–39 (emphases added) (brackets in original) (footnotes omitted).

In some respects, this court's recognition of the tort of bad faith was quite broad. *Best Place* cited with approval the California Supreme Court's decision in *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), which

> established that the defendant's duty of good faith and fair dealing, implied by law, is *unconditional and independent of the performance of plaintiff's contractual obligations.* The *Gruenberg* court explained that, because an insurer's duty is *independent of the contract,* an insured's non-performance of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing. *Id.* 108 Cal.Rptr. at 488,

510 P.2d at 1040. Therefore, the court concluded that *insurance companies owe an absolute duty of good faith and fair dealing to their insureds. Id.*

*Best Place,* 82 Hawai'i at 128, 920 P.2d at 342 (emphases added). This court also "reject[ed] the argument that, absent a fiduciary relationship, an insured can only bring a bad faith cause of action in contract." *Id.* at 130, 920 P.2d at 344.

Nevertheless, *Best Place* neither discussed nor contemplated the application of the tort of bad faith settlement practices in the absence of an insurance contract. *See id.* at 127–30, 920 P.2d at 341–44. This court succinctly stated that "the implied covenant of good faith and fair dealing, *implied in all contracts,* is the legal principle underlying the adoption of a bad faith tort cause of action in the insurance context[.]" *Id.* at 131, 920 P.2d at 345 (emphasis added); *see also id.* at 132, 920 P.2d at 346 (holding "that there is a legal duty, *implied in a first- and third-party insurance contract,* that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent cause of action" (emphasis added)). Even in downplaying the necessity of "the fiduciary duty on the part of the insurer in the third-party context ... [as] but one component of a broader duty to act in good faith and deal fairly with its insured[,]" *Best Place* noted that the *raison d'tre* of the tort of bad faith was to avoid "depriv[ing] the insured of the *benefits for which he or she ha[d] contracted.*" *Id.* at 129, 920 P.2d at 343 (emphasis added).

2. *Implications of footnote seven in Best Place*

Notwithstanding the foregoing, this court observed in *Best Place* that "Hawai'i might recognize a bad faith cause of action brought by an injured claimant *even absent a contractual relationship between the injured claimant and the third-party tortfeasor's insurance company* [,]" although this court "expressly decline[d] to rule on the viability of that particular cause of action in this jurisdiction at [that] time." 82 Hawai'i at 125 n. 7, 920 P.2d at 339 n. 7 (emphasis added).

The suggestion contained in footnote seven, however, by no means implies that the existence of an insurance contract is not a necessary element of the tort of bad faith settlement practices, a proposition that would render nugatory the analytical underpinning of this court's adoption of the claim for relief in the first place. *See supra* section III.A.1. Inasmuch as footnote seven in *Best Place* relied upon this court's decision in *Colonial Penn,* which concerned a bad faith suit brought by an injured party and her insurer against the insurer of a vehicle involved in the subject accident, an insurance contract must underlie any recognition by this court of "a bad faith cause of action brought by an injured claimant ... [against a] third-party tortfeasor's insurance company." *Id.*

Other jurisdictions have acknowledged the necessity of an underlying insurance contract in allowing claims by third-party plaintiffs against insurers precisely because the third-party claimants acquired their claims by way of the relevant insureds. In *Murphy v. Allstate Insurance Co.,* 17 Cal.3d 937, 132 Cal. Rptr. 424, 553 P.2d 584 (1976), for example, the plaintiff recovered a wrongful death judgment in excess of the policy limits against an insured defendant. *Id.* at 939–40, 132 Cal.Rptr. at 425–26, 553 P.2d at 585–86. The insurer, Allstate Insurance Co., remitted payment to the plaintiff, but only in the amount of policy limits. *Id.* The plaintiff, without acquiring any assignment of a bad faith claim from Allstate's insured, filed a direct action against Allstate to recover the unsatisfied portion of the judgment. *Id.*

The California Supreme Court held that, in the absence of any assignment from the insured, the plaintiff could not bring a direct action for bad faith against Allstate to recover the excess amount of the wrongful death judgment, reasoning that the implied covenant of good faith protected the insured, who had the option of assigning his claim for relief against the insurer, in the absence of which the claim could not accrue directly to the benefit of the injured third-party plaintiff. *Id.* at 941–42, 132 Cal.Rptr. at 426–27, 553 P.2d at 586–87. The *Murphy* court further noted as follows:

*The insurer's duty to settle does not directly benefit the injured claimant. . . .*

*The insurer's duty to settle—running to the insured and not to the injured claimant—is* also demonstrated by *Shapero v. Allstate Ins. Co., supra,* 14 Cal.App.3d 433, 92 Cal.Rptr. 244. The insured died leaving no asset other than the insurance policy. Thus, a judgment in excess of policy limits presenting no risk to the insured or to his heirs, *the insurer had no duty to settle within policy limits.*

. . . .

*The insured may assign his cause of action for breach of the duty to settle without consent of the insurance carrier, even when the policy provisions provide the contrary.* (*Comunale v. Traders & General Ins. Co., supra,* 50 Cal.2d at pp. 661–662, 328 P.2d 198.)

*Id.* (internal footnotes omitted) (emphases added).

Further to the foregoing, the California Supreme Court stated that

*[a] third party should not be permitted to enforce covenants made not for his benefit, but rather for others. [The third-party claimant] is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him.* (*Lucas v. Hamm* (1961) 56 Cal.2d 583, 590–591 [15 Cal.Rptr. 821, 364 P.2d 685]; 4 Corbin, Contracts (1951) §§ 775–777, pp. 8–28; 2 Williston, Contracts (1959) § 356A, pp. 835–842.) As to any provision made not for his benefit but for the benefit of the contracting parties or for other third parties, he becomes an intermeddler. Permitting a third party to enforce a covenant made solely to benefit others would lead to the anomaly of granting him a bonus after his receiving all intended benefit. *Because, as we have seen, the duty to settle is intended to benefit the insured and not the injured claimant, third party beneficiary doctrine does not furnish a basis for the latter to recover.* Moreover, Allstate having paid plaintiff the policy limits, she has already received all benefit contemplated by the policy.

*Id.* at 944, 132 Cal.Rptr. at 428, 553 P.2d at 588 (emphases added).

Similarly, in *Long v. McAllister,* 319 N.W.2d 256 (Iowa 1982), the Iowa Supreme Court, in declining to hold that the insurer owes a duty to the third-party claimant to negotiate a settlement in good faith, reasoned as follows:

*We . . . decline to recognize a duty of the insurer to the victim under general tort concepts.* The insurer has a fiduciary duty to the insured but an adversary relationship with the victim. The effect of the policy is to align the insurer's interests with those of the insured. In meeting its duty to the insured, the insurer must give as much consideration to the insured's interests as it does to its own. *It has no such relationship with a third party.* Instead the insurer stands in the shoes of the insured in dealing with the victim. Because the insured has a right to require liability to be proven as a predicate for payment of the loss, the victim cannot compel the insured to negotiate and settle the loss beforehand. No basis exists for giving the victim a greater right when negotiating with the tortfeasor's insurer than exists when the victim negotiates with the tortfeasor directly. . . . *In either event, the victim has a remedy for his injury through a tort action against the insured. That remedy will permit compensation to be ordered when it is justified.*

*We are aware of no jurisdiction that has recognized the kind of third party action advocated by plaintiff in this case.* The absence of authority was noted in *Uebelacker v. Horace Mann Insurance Company,* 500 F.Supp. 180, 183 (E.D.Wis.1980). The action has been rejected in *Kranzush[ v. Badger State Mutual Casualty Company,* 103 Wis.2d 56, 307 N.W.2d 256 (1981)], *Linscott v. State Farm Mutual Automobile Insurance Co.,* 368 A.2d 1161 (Me.1977), and *Bowe v. Eaton,* 17 Wash. App. 840, 565 P.2d 826 (1977). We join the courts that have rejected it.

319 N.W.2d at 262–63 (some internal citations omitted) (emphases added).

Several other jurisdictions have employed the assignment theory of common law third-party claims of bad faith settlement prac-

tices, inherently requiring the existence of a contractual relationship between an insurer and an insured as predicate to establishing an injured claimant's right to sue a tortfeasor's insurer. *See Messina v. Nationwide Mut. Ins. Co.,* 998 F.2d 2, 5 (D.C.Cir.1993) (holding that "[w]hen there is no contractual relationship between the claimant and the insurer, ... the implied covenant does not exist, and hence there is no doctrinal basis for holding the insurer liable in tort"); *Richards v. State Farm Mut. Auto. Ins. Co.,* 252 Ga.App. 45, 555 S.E.2d 506, 507 (2001) (observing that, "[g]enerally, a party not in privity of contract may not bring a direct action suit against the liability insurer of the party alleged to have caused damage absent an unsatisfied judgment against the insured, legislative mandate, or as permitted by a provision in the insurance policy in issue"); *Metropolitan Property & Casualty Ins. Co. v. Crump,* 237 Ga.App. 96, 513 S.E.2d 33, 34 (1999) (affirming that, while "an insured may make a claim against his insurer for ... bad faith[,] ... it does not follow that a person injured by the insured and who is not a party to the insurance contract may complain of the ... bad faith of the insurer towards its policyholder[,]" inasmuch as "the duty of the insurance company to use ordinary care and good faith ... arises out of ... the contract ... of insurance, and there is no ... privity of contract ... between the insurer and a person injured by one of its policyholders"); *Lantier v. Aetna Casualty & Sur. Co.,* 614 So.2d 1346, 1359 (La.Ct.App.1993) (noting that "[the] duty to not conduct settlement negotiations in bad faith and to not act arbitrarily and capriciously under the circumstances is owed by the insurer to its insured only"); *Dvorak v. American Family Mut. Ins. Co.,* 508 N.W.2d 329, 331 (N.D.1993) (ruling that "[a]bsent a clause in the insurance contract bestowing the right to bring a direct action against the insurer, an injured party's claim must be asserted against the tortfeasor, not the tortfeasor's insurer"); *See v. Nationwide Mut. Ins. Co.,* No. 00CA007680, 2001 WL 458673, at *2 (Ohio Ct.App. May 2, 2001) (stating that "the insurer's duty to act in good faith only extends to the insured; therefore, a third party cannot bring a claim against a tortfeasor's insurance company for breaching the duty to act in good faith"); *Tanoh v. Strawbridge,* No. 76094, 2000 WL 640378, at *7 (Ohio Ct.App. May 18, 2000) (observing that, "[w]hile a liability insurance carrier may have a duty outside the terms of its insurance contract to deal in good faith with the public, including those persons injured by the actions of its insured, such duty does not create an independent cause of action that may be enforced by the injured party through a direct action against the insurance carrier"); *White v. Averitt Express, Inc.,* No. 99–CA–104, 2000 WL 543323, at *3 (Ohio Ct.App. May 5, 2000) (noting that "a claim of bad faith cannot be brought against an insurer by a third-party claimant" and that "[t]he duty to act in good faith runs only from the insurer to its own insured" (internal citations omitted)); *Bowman v. Charter Gen. Agency, Inc.,* 799 S.W.2d 377, 380 (Tex.Ct.App.1990) (refusing to "extend[ ] an insurer's duty of good faith and fair dealing to provide a remedy to an injured third-party outside the workers' compensation area" where "[n]o contractual relationship existed between the parties"); *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 279–280 (Tex.1995) (noting that "[a] third party claimant has no contract with the insurer or the insured, has not paid any premiums, has no legal relationship with the insurer, and in short, has no basis upon which to expect or demand the benefit of ... extra-contractual obligations imposed on insurers" (internal citation and quotation signals omitted)); *Planet Ins. Co. v. Wong,* 74 Wash.App. 905, 877 P.2d 198, 201 (1994) (observing that, although "[a]n injured third party has no right of action against an insurance company for bad faith[,]" "an insured may assign his or her rights to a bad faith claim to a third party" (internal citations omitted)); and *Herrig v. Herrig,* 844 P.2d 487, 491–92 (Wyo.1992) (holding that "the duty of good faith and fair dealing runs only from the insurer to the insured" and that "no basis is present for extending an insurers' duty of good faith and fair dealing to third-party claimants, even in the context of intra-family suits").

Thus, based on the foregoing analysis and the overwhelming weight of persuasive extra-jurisdictional jurisprudence, we hold that any

formal recognition of a claim for relief in favor of an injured claimant against a third-party tortfeasor's insurance company for bad faith settlement practices would require the assignment of the insured tortfeasor's rights arising from an underlying insurance contract to the injured plaintiff.[8]

## B. *Self–Insurer Liability Generally*

Having established that the common law tort of bad faith settlement practices arises only from a contract of insurance, we now address self-insurer liability. This court has previously explained the legislative framework underlying self-insurance as follows:

> Since 1974, Hawai'i has operated under a statewide system of mandatory no-fault insurance. The purpose of the Motor Vehicle Insurance Law, HRS Chapter 431, Article 10C (1993), is set out in § 431:10C–102:
>
> (a) The purpose of this article is to:
>
> (1) Create a system of reparations for accidental harm and loss arising from motor vehicle accidents;
>
> (2) Compensate these damages without regard to fault; and
>
> (3) Limit tort liability for these accidents.

> (b) To effectuate this system of motor vehicle insurance and to encourage participation by all drivers in the motor vehicle insurance system:
>
> (1) Those uninsured drivers who try to obtain the privilege of driving a motor vehicle without the concomitant responsibility of an ability to compensate adequately those who are injured as a result of a motor vehicle accident are to be dealt with more severely ... [.]

> ... As expressed in the legislative history, the legislature, in passing this no-fault insurance system into law, was

> of the belief that a basic, comprehensive, equitable and reasonably priced auto insurance policy must satisfy each of the following criteria:
>
> (1) Provide for a speedy, adequate and equitable reparation for those injured or otherwise victimized;
>
> (2) Provide for the stabilization and reduction of motor vehicle liability insurance premium rates;
>
> (3) Provide insurance coverage for all who require it, at a cost within the reach of every licensed driver;
>
> (4) Provide for a compulsory insurance system;

---

**8.** *But see Thompson v. Commercial Union Ins. Co.*, 250 So.2d 259, 264 (Fla.1971) (holding "that a judgment creditor may maintain suit directly against [a] tortfeasor's liability insurer for recovery of the judgment in excess of the policy limits, based upon the alleged fraud or bad faith of the insurer in the conduct or handling of the suit").

Notwithstanding the *Thompson* court's approval of a third-party claimant's cause of action against an insurer without an assignment by an insured, the Florida Supreme Court subsequently explained that fundamental tenets of a bad faith suit, including the requirement of an underlying insurance contract, remained intact:

> In *Thompson* this Court, contrary to our prior decision in *Sturgis v. Canal Insurance Co.*, 122 So.2d 313 (Fla.1960), authorized an injured party to maintain a bad faith claim against an insurer. The Court based *Thompson* on public policy and justified it on the *Shingleton v. Bussey*, 223 So.2d 713 (Fla.1969), third party beneficiary concept and the right of a real party in interest to maintain a suit. *Nowhere in Thompson, however, did we change the basis or theory of recovery. We did not extend the duty of good faith by an insurer to its insured to a duty of an insurer to a third party. The basis for an action remained the damages of an insured from the bad faith action of the insurer which caused its insured to suffer a judgment for damages above his policy limits. Thompson merely allowed the third party to bring such an action in his own name without an assignment.*

*Fidelity & Casualty Co. v. Cope*, 462 So.2d 459, 460–61 (Fla.1985) (emphasis added). The *Cope* court also noted that

> [t]he essence of a "bad faith" insurance suit (whether it is brought by the insured or by the injured party standing in his place), is that the insurer breached its duty to its insured by failing to properly or promptly defend the claim (which may encompass its failure to make a good faith offer of settlement within the policy limits)—all of which results in the insured being exposed to an excess judgment.

*Id.* at 460 (emphasis added) (internal citation and quotation signals omitted).

Thus, even extrajurisdictional authority that allows a direct bad faith claim by an injured third party against an insurer adheres to the principle that the duty of good faith settlement practices arises from an underlying insurance contract.

(5) Provide for adequate regulatory control.

Hse. Conf. Comm. Rep. No. 13, in 1973 House Journal, at 1219; *see also* Sen. Conf. Comm. Rep. No. 4, in 1973 Senate Journal, at 635. With this intention, the legislature enacted, *inter alia*, HRS § 431:10C–104 (1993):

**Conditions of operation and registration of motor vehicles.** (a) ... [N]o person shall operate or use a motor vehicle upon any public street, road or highway of this State at any time unless such motor vehicle is insured at all times under a no-fault policy.

(b) Every owner of a motor vehicle used or operated at any time upon any public street, road or highway of this State shall obtain a no-fault policy upon such vehicle which provides the coverage required by this article and shall maintain the no-fault policy at all times for the entire motor vehicle registration period.

The basic no-fault policy requirement is outlined in HRS § 431:10C–301(a) (1993):

**Required motor vehicle policy coverage** (a) In order to meet the requirements of a no-fault policy as provided in this article, an insurance policy covering a motor vehicle shall provide:

(1) Coverage specified in section 431:10C–304; and

(2) Insurance to pay on behalf of the owner or any operator of the insured motor vehicle using the motor vehicle with the express or implied permission of the named insured, sums which the owner or operator may legally be obligated to pay for injury, death, or damage to property of others ... which arise out of the ownership, operation, maintenance, or use of the motor vehicle[.]

The operation of a vehicle not covered under either a no-fault policy or an approved certificate of self-insurance can lead to penalties, including fines, suspension of vehicle registration, and imprisonment. *See* HRS §§ 431:10C–104(c) and 431:10C–117 (1993); Hawai'i Administrative Rules (HAR) § 16–23–2 (1993).

The only exception to this sweeping mandate of a no-fault insurance policy on all vehicles is for qualified self-insurers:

The motor vehicle insurance required by section 431:10C–104 may be satisfied by any owner of a motor vehicle if:

(1) Such owner provides a surety bond, proof of qualifications as self-insurer, or other securities affording security substantially equivalent to that afforded under a no-fault policy, providing coverage at all times for the entire motor vehicle registration period, as determined and approved by the commissioner under regulations; and

(2) The commissioner is satisfied that in case of injury, death or property damage, any claimant would have the same rights against such owner as the claimant would have had if a no-fault policy had been applicable to such vehicle.

HRS § 431:10C–105 (1993)....

A person seeking to qualify as a self-insurer must apply to the insurance commissioner in the state's Department of Commerce and Consumer Affairs (DCCA). HAR § 16–23–20 (1993). The DCCA's regulations seek to implement the legislature's directive that a self-insurer provide identical benefits to those available under the state-wide no-fault policy mandate. *See* HAR § 16–23–21 (detailing required content for agreement as self-insurer); § 16–23–22 (financial responsibility requirement); § 16–23–24 (proof of ability to process and pay claims promptly); § 16–23–31 (providing for revocation of certification of self-insurance for good cause).

*Ricardo,* 85 Hawai'i at 245–46, 942 P.2d at 509–10 (emphases omitted).

In addition to complying with the statutory and regulatory scheme noted in *Ricardo,* Hertz was required to execute and file the following "self-insurer agreement":

### MOTOR VEHICLE INSURANCE DIVISION

### SELF–INSURER AGREEMENT

This Agreement, made this 1st day of July, 1978, by and between the State of

Hawai'i, by its State Commissioner of Motor Vehicle Insurance, hereinafter called the "Commissioner," and ... Hertz

## WITNESSETH THAT:

WHEREAS, Chapter 294, Hawai'i Revised Statutes, regulates the reparations for accidental harm and loss arising from motor vehicle accidents; and

WHEREAS, Section 294–8 requires each person to obtain a no-fault policy in order to register and operate a motor vehicle upon a public highway or street; and

WHEREAS, Section 294–8 further provides that if a surety bond in a reasonable amount is secured and proof of qualifications to be a self-insurer is met, said owner need not obtain a no-fault policy; and

WHEREAS, pursuant to Chapter 294, Hawai'i Revised Statutes, Rules and Regulations of the Motor Vehicle Insurance Division were promulgated and adopted, hereinafter "Rules"; and

WHEREAS, Part VI of said Rules and Regulations provides that a person desiring to qualify as a self-insurer shall execute and file an agreement, upon certification as a self-insurer, with the Commissioner;

NOW, THEREFORE, Hertz, in consideration of the aforesaid, shall:

1. In accordance with and to the extent prescribed in Chapter 294, Hawai'i Revised Statutes, and the Rules adopted pursuant to said chapter:

    a. In case of injury, arising out of a motor vehicle accident, to a person, including an operator, occupant or user of the self-insured motor vehicle or any pedestrian struck by said vehicle, pay without regard to fault to such person an amount equal to the no-fault benefits payable to such a person as a result of such injury;

    b. In case of death, arising out of a motor vehicle accident, of a person, including an operator, occupant, or user of the self-insured motor vehicle, or any pedestrian struck by said vehicle, pay without regard to fault, to the legal representative of such person for the benefit of the surviving spouse and any dependent, as defined in Section 152 of the Internal Revenue Code of 1954, of such person, an amount equal to the no-fault benefits payable to such spouse and dependent as a result of such death; and

    c. Pay on behalf of itself or any operator of a self-insured motor vehicle sums which it or the operator may legally be obligated to pay for injury or death or damage to property of others which arise out of the ownership, operation, maintenance, use, loading or unloading of the self-insured motor vehicle.

2. Permit the commissioner or his authorized representative to inspect and copy records and provide him copies of records pertaining to the self-insurer's financial condition, processing and payment of claims and any other matters pertinent to the administration and enforcement of the no-fault law.

3. Comply with all requirements of the no-fault law, regulations, directives or orders of the Commissioner, including those relating to processing and payment of claims and payment of assessments and fees.

4. Designate an officer to accept service of process who resides in this State.

5. Notify the Commissioner and the county director of finance of the county of registration in writing of any change in status of any motor vehicle of which it is self-insurer, such as transfer, sale, removal from the State, or additions, within 10 working days after the change is effected.

6. Pay to the Commissioner, annually, a fee of one dollar per year or part thereof on each motor vehicle which it is self-insuring. The fee will be computed on the basis of one dollar times the total number of insured vehicles reported on the December 31, Insured Vehicle Census Report, MVID 14–2(1). The fee shall be remitted annually with the Census Report, which is due on or before February 15 of each year.

7. Submit the reports prescribed by Part XIII (data for establishment of the

90% medical-rehabilitative threshold), and Part XIV (statistical and reporting requirements) as prescribed by the Rules.

This Agreement does not attempt to include all of the requirements of Chapter 294, Hawai'i Revised Statutes, and the Rules adopted thereto. The omission of any legal requirements imposed by statute or Rules in this Agreement shall not be construed as a waiver of such requirement by the Commissioner. Hertz further agrees that any future legal requirements that may be imposed as a result of amendments to Chapter 294, Hawai'i Revised Statutes, or the Rules shall, wherever applicable, automatically be incorporated into this Agreement.

This Agreement shall remain in full force and effect so long as Hertz has a certificate of self-insurance.

The agreement was signed by the state commissioner of motor vehicle insurance on behalf of the State of Hawai'i, the vice president of Hertz's insurance division, and Hertz's assistant secretary.

■ The scope of a self-insurer's duties, however, is not coextensive with that of licensed insurance carriers. In *Ricardo*, this court held that a self-insured rental car company could not be held liable under a statute requiring that insurers pay attorneys fees after unsuccessfully contesting liability, relying in part upon this court's observations in *Budget Rent–A–Car Systems v. Coffin*, 82 Hawai'i 351, 922 P.2d 964 (1996):

HRS § 431:10C–103(5) defines "insurer" as "every person holding a valid certificate of authority to engage in the business of making contracts of motor vehicle insurance in this State." *Budget ... is not "in the business of making contracts of motor vehicle insurance"; to the contrary, Budget is merely the self-insured "owner" of a fleet of motor vehicles that it permits others to use for a fee.* To hold otherwise would effectively render all car rental companies doing business in Hawai'i "insurers," regardless of whether they are self-insurers or not, generally subjecting them to the requirements of HRS chapter 431 and to the regulatory control of the insur-

ance commissioner and the Department of Commerce and Consumer Affairs.

*Ricardo*, 85 Hawai'i at 250, 942 P.2d at 514 (quoting *Coffin*, 82 Hawai'i at 356–57, 922 P.2d at 969–70 (footnotes omitted)) (emphasis added). Although *Ricardo* did note that, notwithstanding that self-insurers are not liable under the attorneys fees statute, "self-insurers are in fact subject to the regulatory control of the insurance commissioner and the Department of Commerce and Consumer Affairs," this court made no mention of any duty of good faith settlement practices that would give rise to a common law tort claim for relief. *Id.* at 250 n. 3, 942 at 514 n. 3 (citing HRS § 431:10C–105(1); HAR §§ 16–23–20 through 16–23–32 (1993)).

Moreover, *Coffin* noted that

[a self-insured rental car company's] rental agreement is not a contract of insurance and is not the source of the customer's entitlement to insurance coverage; the customer is statutorily entitled to the minimum motor vehicle insurance coverage required by HRS § 431:10C–301. In this light, ... the rental agreement does not independently confer any insurance coverage ... and, *most importantly, the rental company is not an "insurer" as defined by HRS § 431:10C–103(5).*

82 Hawai'i at 357, 922 P.2d at 970 (emphasis added). Based on the principles articulated in *Coffin*, this court held in *Alzharani* that a self-insured car rental company was not an "insurer" required to offer uninsured motorist coverage to its customers, such that the car rental company was entitled to summary judgment against a customer seeking uninsured motorist benefits for injuries resulting from an accident involving two uninsured vehicles. *Alzharani*, 82 Hawai'i at 472–73, 923 P.2d at 414–15. Inasmuch as *Alzharani* resolved the matter on the foregoing and other bases, it did not address the customer's claim of bad faith settlement practices, but expressly noted as follows:

We do note, however, relative to Alzharani's bad faith claim, that this court recently expressly acknowledged that an independent cause of action exists in Hawai'i for the breach of an *insurer's* duty to act in good faith in both first- and third-party

*contracts of insurance. See The Best Place, Inc. v. Penn America Insurance Co.,* 82 Hawai'i 120, 132, 920 P.2d 334, 346 (1996), ("[T]here is a legal duty, implied in a first- and third-party *insurance contract,* that the *insurer* must act in good faith in dealing with its *insured,* and a breach of that duty of good faith gives rise to an independent tort cause of action.") 82 Hawai'i at 473 n. 9, 923 P.2d at 414–15 n. 9 (emphases added).

### C. *Analysis*

■ In addressing the question whether Curtis had a claim for relief against Hertz for bad faith settlement practices, there are three legal principles that guide our analysis: (1) the common law tort of bad faith arises out of an insurer's contractual duty to deal in good faith, *see supra* section III.A.1; (2) a third-party injured claimant does not have a bad faith claim for relief unless the insured tortfeasor assigns the claim, which, as we have said, arises from an insurance contract, *see supra* section III.A.2; and (3) self-insurers are not insurers, inasmuch as they are "not 'in the business of making contracts of motor vehicle insurance,'" *Coffin,* 82 Hawai'i at 356, 922 P.2d at 969. *See supra* section III.B. Notwithstanding the foregoing principles, Curtis maintains that he had a claim for relief for bad faith based upon third-party beneficiary theory, inasmuch as "Hertz's [self-insurer a]greement with the State required that Curtis ... be assured that Hertz as a self-insurer would fairly process and promptly pay his claims." In support of his contention, Curtis cites *Hough v. Pacific Ins. Co., Ltd.,* 83 Hawai'i 457, 927 P.2d 858 (1996), *Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 883 P.2d 38 (1994), and *Hunt v. First Ins. Co. of Hawai'i, Ltd.,* 82 Hawai'i 363, 922 P.2d 976 (App.1996), for the proposition that a party who is not in privity of contract with an insurer may nonetheless assert a claim for relief for bad faith against the insurer by way of such "third party beneficiary theory."

As discussed *supra* in section III.A.2, the majority of courts that have considered the question have relied upon the "assignment" theory rather than the third-party beneficiary doctrine in addressing the viability of claims by third-party injured plaintiffs against insurers. *See, e.g., Murphy,* 17 Cal.3d at 944, 132 Cal.Rptr. at 428, 553 P.2d at 588 ("Because ... the duty to settle is intended to benefit the insured and not the injured claimant, *third party beneficiary doctrine does not furnish a basis for the latter to recover.*" (Emphasis added.)). Curtis's citation of *Hough, Dawes,* and *Hunt* is inapposite to the present matter because each of those cases involved an underlying insurance contract and the liability of the insurer *qua* insurer, rather than that of a self-insured party. *See Hough,* 83 Hawai'i at 459–60, 927 P.2d at 860–61; *Dawes,* 77 Hawai'i at 119–21, 883 P.2d at 40–42; *Hunt,* 82 Hawai'i at 364–66, 922 P.2d at 977–79.

Furthermore, as discussed *supra* in note 8, even when courts have "allowed the third party to bring ... [a bad faith] action in his own name without an assignment" based on the "third party beneficiary concept and the right of a real party in interest to maintain a suit[,]" they have expressly declined to "extend the duty of good faith by an insurer to its insured to a duty of an insurer to a third party" and have stated that "[t]he basis for an action remained the damages of an insured from the bad faith action of the insurer which caused its insured to suffer a judgment for damages above his policy limits." *See Fidelity & Casualty Co. v. Cope,* 462 So.2d 459, 460–61 (Fla.1985). The *Cope* court also observed that "[t]he essence of a 'bad faith' insurance suit (whether it is brought by the insured or by the injured party standing in his place) is that the insurer breached its duty to its insured[.]" *Id.* at 460. Thus, even if Curtis could benefit from third-party beneficiary status in a claim for relief against a tortfeasor's liability insurance carrier, there being no underlying insurance contract from which the duty of good faith settlement practices could arise in the present case, Curtis still has no right to sue Hertz—a self-insured rental company—for such bad faith.

By its plain language, Hertz's self-insurer agreement is not an insurance contract. *See Coffin,* 82 Hawai'i at 356, 922 P.2d at 969 (ruling that self-insurers are "not 'in the business of making contracts of motor vehicle insurance'"). Other jurisdictions that have

specifically addressed self-insurer liability to third-party injured claimants have similarly held that no claim for relief may lie without the existence of an underlying insurance contract and that self-insurer agreements are insufficient in themselves. In *Southeastern Pennsylvania Transp. Auth. v. Holmes,* 835 A.2d 851 (Pa.Cmwlth.2003), *appeal denied,* 848 A.2d 930 (Pa.2004), the Pennsylvania Commonwealth Court held that injured passengers could not maintain a common law bad faith action against a self-insured transportation authority, reasoning as follows:

> [T]he trial court ... reason[ed] that privity of contract can be established under an implied contract theory....
>
> There are several flaws in the trial court's holding. First, *there was no contract.* [The self-insurer's] liability to [the injured claimants] arose under the Uninsured Motorists provisions of the [Pennsylvania Motor Vehicle Financial Responsibility Law]. *Therefore, there can be no privity of contract; [the self-insurer] is the sole party to a self-insurance arrangement.* ...

*Id.* at 858 n. 24 (emphases added). The *Holmes* court further stated that

> in the absence of a written contract, [the injured claimants] must establish an implied duty to act fairly and in good faith on the claims of its injured passengers. However, [the injured claimants] cannot satisfy the prerequisites for an implied duty because there is no confidential or fiduciary relationship between [the injured claimants] and [the self-insurer].
>
> *In the absence of a contractual relationship between [the self-insurer] and [the injured claimants], there is no basis for asserting the breach of good faith and fair dealing doctrine.*

*Id.* at 859 (emphasis added).

Addressing the same issue, the West Virginia Supreme Court of Appeals reasoned as follows:

> When asked to consider whether Kentucky's Unfair Claims Settlement Practices Act and the tort of bad faith apply to persons or entities who are self-insured or uninsured, the Supreme Court of Kentucky "conclude[d] that both the statute and *the*

*common law tort apply only to persons or entities engaged in the business of insurance* [.]" *Davidson v. American Freightways, Inc.,* 25 S.W.3d 94, 95 (Ky.2000). We quote, with approval from the court's reasoning:

> The gravamen of the UCSPA is that an insurance company is required to deal in good faith with a claimant, whether an insured or a third-party, with respect to a claim which the insurance company is contractually obligated to pay. *Absent a contractual obligation, there simply is no bad faith cause of action, either at common law or by statute.*

*Id.* at 100....

> In the case at bar, Ford's principal business is the manufacture and sale of automobiles. Ford is not an insurer and is under no *contractual obligation* to pay the [injured claimants'] claim. *Thus, there exists no ... common law basis for a bad faith claim against the company. We hold that ... the tort of bad faith appl[ies] only to those persons or entities and their agents who are engaged in the business of insurance. In other words, absent a contractual obligation to pay a claim, no bad faith cause of action exists, either at common law or by statute. A self-insured entity is not in the business of insurance.*

*Hawkins v. Ford Motor Co.,* 211 W.Va. 487, 566 S.E.2d 624, 629 (2002) (some emphases added and some in original).

In *Loomis v. Ameritech Corp.,* 764 N.E.2d 658 (Ind.Ct.App.2002), the Indiana Court of Appeals, in ruling that a self-insured corporation was not subject to the implied covenant of good faith and fair dealing, observed that

> [t]here is a legal duty implied in insurance contracts that the insurer deal in good faith with its insured. *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 518 (Ind.1993). *However, the duty does not extend to claimants other than the insured. Dimitroff v. State Farm Mut. Auto. Ins. Co.,* 647 N.E.2d 339, 342 (Ind.Ct.App.1995). *Further, "self-insurance" is not insurance at all. Eakin v. Indiana Intergovernmen-*

*tal Risk Mgmt. Auth.*, 557 N.E.2d 1095, 1098 (Ind.Ct.App.1990).

*Id.* at 668 (emphases added).

## IV. *CONCLUSION*

In light of the foregoing, we hold, consonant with the great weight of extrajurisdictional authority and the requirement that a contract underlie the tort of bad faith, that an injured third-party claimant does not have a claim for relief for bad faith against a self-insured tortfeasor. Accordingly, we affirm the final judgment of the circuit court, filed on August 2, 2000, as to all claims and parties.