142 P.3d 277

Terrie L. THOMPSON and Dwight Thompson, Plaintiffs/Counterclaim Defendants–Appellees,

v.

AIG HAWAII INSURANCE COMPANY, INC., a Hawai'i corporation; and American International Adjustment Company, Inc., a Delaware corporation, Defendants/Counterclaimants Cross–Claim Plaintiffs/Cross–Claim Defendants–Appellants,

Burton D. Gould, Defendant/Cross–Claim Plaintiff/Cross–Claim Defendant,

Larry Mark Polsky, Defendant/Cross–Claim Plaintiff,

Polsky & Gould, a Hawai'i partnership, Defendant/Cross–Claim Defendant/Cross–Claim Plaintiff–Appellee,

Josephine D. Medeiros, Defendant/Cross–Claim Plaintiff–Appellee,

John Does 2–10, Doe Corporations 1–10, Doe Partnerships 1–10, and Doe Entities 1–10, Defendants.

No. 27463.

Supreme Court of Hawai'i.

Sept. 5, 2006.

**414**

Roy F. Epstein and Carlos D. Perez–Mesa (of Epstein & Perez–Mesa), on the briefs, for defendants/counter-claimants cross-claim plaintiffs/cross-claim defendants-appellants

AIG Hawaii Ins. Co., Inc. and American International Adjustment Co., Inc.

Woodruff K. Soldner (of Leavitt, Yamane & Soldner), on the briefs, Honolulu, for plaintiffs/counterclaim defendants-appellees Terrie L. Thompson and Dwight Thompson.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

This appeal concerns the sole question whether the plaintiffs-appellees Terrie L. Thompson (Mrs. Thompson) and Dwight Thompson (Mr. Thompson) [hereinafter, collectively, the plaintiffs] are entitled to rescind a settlement agreement, releasing all claims for personal injuries arising from an automobile accident, on the ground of unilateral mistake, pursuant to Restatement (Second) of Contracts [hereinafter, Restatement] §§ 153 and 154 (1981), quoted *infra*. Briefly stated, Mrs. Thompson was involved in a rear-end motor vehicle collision caused by defendant Josephine D. Medeiros, who is not a party to the instant appeal. The plaintiffs[1] eventually settled their personal injury claim with Medeiros in the amount of $35,000, which was paid by Medeiros's automobile liability insurer, defendant-appellant AIG Hawai‘i Insurance Company, Inc. (AIG), through its adjusting company, defendant-appellant American International Adjustment Company, Inc. (AIAC)[2] [hereinafter, AIG and AIAC are collectively referred to as the defendants]. At the time of the settlement, the plaintiffs believed that the $35,000 represented the liability limit of Medeiros's motor vehicle insurance policy when, in fact, the policy limit was $300,000. The plaintiffs brought suit against Medeiros, their former attorneys, AIG, and AIAC, seeking, *inter alia*, rescission of the settlement agreement. Ultimately, the Circuit Court of the Second Circuit[3] found that the settlement agreement was unenforceable on the ground of unconscionability and granted the plaintiffs'

---

1. Although Mrs. Thompson was the only one involved in the accident, Mr. Thompson asserted a claim for loss of consortium.

2. At all times relevant herein, AIAC, as the adjusting agent for AIG, handled all liability claims

against AIG. Thus, the acts of AIAC and/or its employees and agents are imputed to AIG.

3. The Honorable Reinette W. Cooper presided over the underlying proceedings unless otherwise indicated.

motion for summary judgment. An amended final judgment was entered on August 2, 2005.

On appeal, the defendants advance two points of error committed by the circuit court. First, the defendants contend that the circuit court failed to apply Hawai'i Revised Statutes (HRS) § 490:2–302 (1993), quoted *infra*, which dictates that unconscionability is determined under the circumstances existing at the time the contract was made. Second, the defendants claim that there are genuine issues of material facts regarding whether the settlement agreement was unconscionable, thereby rendering summary judgment inappropriate.

For the reasons discussed herein, we vacate the circuit court's August 2, 2005 amended final judgment and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

On October 6, 1990, Mrs. Thompson was involved in a rear-end motor vehicle collision caused by Medeiros (the accident). As a result of the accident, Mrs. Thompson sustained severe personal injuries, including bilateral temporomandibular joint displacements, post-traumatic stress disorder, depression, and cervical, thoracic, and right shoulder injuries.

Shortly after the accident, the plaintiffs retained defendant Burton D. Gould—a nonparty to the instant appeal—as counsel to represent them in connection with their personal injury claim against Medeiros [hereinafter, the personal injury action]. As a result of settlement negotiations between Gould and the defendants' senior claims adjuster, Billie R. Long, the plaintiffs entered into a settlement agreement on June 26, 1991. In return for a payment of $35,000, the plaintiffs released all claims arising from the accident [hereinafter, the 1991 release] against Medeiros. The plaintiffs executed the 1991 release based upon Gould's representation that Long had informed him that the $35,000 represented the entirety of Medeiros's liability insurance coverage when, in fact, the policy limit was $300,000. Gould testified in his deposition that Long had represented that she was paying the policy limit of $35,000 in order to settle the personal injury action:

Q. [By plaintiffs' counsel] ... At the time that you purportedly settled [the plaintiffs'] claims against [Medeiros] for $35,000, you were under the impression that [Medeiros] had only a $35,000 minimum policy limit of bodily injury liability coverage through [AIG], correct"

A. [By Gould] Yes.

Q. How did you gain that impression?

A. Well, in talking with [Long], I remember asking for a lot more, and then part of the conversation went well, I don't—

Q. When you say "asking for a lot more," what do you mean?

A. You know, I am talking about memory now. I think I might have asked for seventy or something like that.

Q. In other words, you thought [Mrs. Thompson's] claims were worth a lot more than $35,000, correct?

A. Yes, double, something like that, yes. And then she said something to the effect, well, we don't have that. All there is, is the thirty-five. Something like that.

Q. Okay. Are those the exacts words?

A. Okay, I am going to try to get the exact words. When we were negotiating, she said, you can have the thirty-five, I remember. And with everything else she said before—taking it out of context, it's hard, but with everything she said before and with the fact that [Medeiros], I believe, was just a private person, you know, not a business person, and with what she said, I believe there was only thirty-five. When she said, well, we don't have that, all I have is the thirty-five. To me, that would mean the thirty-five minimum policy.

. . . .

... In other words, she didn't say, well, I can offer you thirty-five and that's it.

She said, you can have the thirty-five. To me, that meant that.

Gould further testified that:

Q. [By plaintiffs' counsel] When you were talking about the numbers in excess of $35,000, she had said, we don't have that?

A. [By Gould] Yes. Like, oh, no, but you can have the thirty-five.

Q. Your impression was she didn't have insurance coverage for the value of claim in excess of $35,000?

A. Yes, yes. And the impression wasn't gained from just one set of words or phrases, it was the entire conversation and the previous calls, just her attitude. . . . The thirty-five to me means that's what their policy limits are, because there was no mention of thirty-five before, where she had made an offer, and said, well, you can have the thirty-five that I offered you last time. She said, you can have the thirty-five that we have, or something like that.

It is undisputed that Gould never inquired about Medeiros's policy limit, or requested a declaration page from AIG. Instead, as indicated above, Gould assumed that the $35,000 offer by Long represented Medeiros's policy limit.

Long, however, testified that she represented to Gould that $35,000 was all the authority that she had to settle the personal injury action. Specifically, Long stated:

Mr. Gould came down to $55,000 from his initial demand. I advised I could order the check today if he would accept *the $35,000, which was [the] limit of my authority.*

(Emphasis added.) Long's testimony further reveals that:

Q. [By plaintiffs' counsel] [Y]ou . . . found out that Mrs. Thompson's medical special damages totaled $7,273.08, is that correct?

A. [By Long] Yes.

. . . .

Q. So at that point on April 1, 1991, you knew that Mrs. Thompson was receiving chiropractic treatment, that her injuries were whiplash, and that her medical expenses were $7,273.08, is that correct?

A. Yes.

Q. And at that point, you then requested a reserve on the case of $35,000?

A. Yes.

Q. Why did you choose the number $35,000 for the reserve?

A. Reserving is just guess work. You just try to pick an amount that you think is appropriate and that your settlement will be under that amount.

Q. What would happen if you just said, let's reserve this at $300,000.

A. Oh, I couldn't have. There was nothing to support it. Your paper must support what you're requesting.

Q. So it's not really guess work. It's an estimation, then.

A. It's an estimation.

Q. Okay. What went into the estimation that this should be reserved at $35,000?

A. The fact that[,] within six months, she had $7,000 and some dollars worth of medical bills. I had no idea how long she would be treating or how much coverage she had.

Q. And so with your experience and the amount of specials, you requested a $35,000 reserve.

A. Yes.

. . . .

Q. And is it correct that your goal is to settle cases for as little as possible?

A. My goal is to settle cases for their value.

When asked the reasons why she considered the settlement with the plaintiffs a "good settlement"—*i.e.,* specifically, "is that an indication on your part that you thought you had settled the case cheaply?"—she replied, "No. I settled it for its true value."

Additionally, Gould recommended that the plaintiffs pursue a claim for underinsured motorist (UIM) benefits from their own no-fault insurance carrier, Fireman's Fund Insurance Company (Fireman's Fund). That same day, June 26, 1991, Gould presented a UIM claim to Fireman's Fund, stating in his letter that:

M[rs]. Thompson was very seriously injured in an accident on October 8, 1990[sic]. [Medeiros's] insurance company, AIG ... paid their full policy limit of $35,000 on June 26, 1991.

Thereafter, Fireman's Fund refused the UIM claim on the basis that the plaintiffs had failed to obtain the full available bodily injury liability insurance coverage from Medeiros.[4]

### B. *Procedural History*

#### 1. The Complaint

On February 22, 1993, the plaintiffs, via their new attorneys, filed suit against their former attorneys—Gould, defendant Larry Mark Polsky, and their attorneys' law firm, defendant Polsky & Gould,[5]—and the defendants based on the circumstances surrounding the settlement of their claims arising out of the accident.[6] On March 10, 1994, the plaintiffs amended their complaint to add Medeiros as a party.[7] The amended complaint alleged: (1) negligence as against Medeiros and the former attorneys; (2) breach of fiduciary duty against the former attorneys; (3) negligent misrepresentation against

Gould and the defendants; (4) fraud and unfair claims practices against the defendants; (5) unfair deceptive acts or practices, in violation of HRS § 480–2 (1993), against the defendants and the former attorneys; and (6) joint and several liability against *all* defendants [hereinafter, the rescission action].

#### 2. Motion to Rescind the 1991 Release

On December 9, 1994, the plaintiffs filed a motion to rescind the 1991 release (the motion to rescind). The plaintiffs asserted that, under *Gossinger v. Association of Apartment Owners of the Regency of Ala Wai*, 73 Haw. 412, 835 P.2d 627 (1992), this court held that, in order to rescind a release, the "mistake" must relate to a "past or a present fact." *Id.* at 421–22, 835 P.2d at 632 ("If the mistake relates clearly to a past or a present fact[,] the remedy of cancellation will be awarded." (Citation omitted.)). The plaintiffs argued that they and/or Gould entered into the 1991 release agreement under the mistaken belief that $35,000 was the bodily injury liability policy limit of Medeiros's coverage with AIG. They contended that the fact that Medeiros had a $300,000 policy limit was a "past or a

---

4. Prior to Fireman's Fund's discovery of Medeiros's policy limit, Fireman's Fund offered $15,000 in which to settle the plaintiffs' UIM claim. However, Gould declined such offer.

5. As previously stated, Gould is not a party to the instant appeal; similarly, Polsky and Polsky & Gould are not parties to this appeal [hereinafter, Gould, Polsky, and Polsky & Gould are collectively referred to as the former attorneys]. On April 23, 1993, Polsky and Polsky & Gould moved for partial summary judgment in the instant case, asserting that

> Gould did not become associated with Polsky until October 1, 1992[, when they formed the partnership of Polsky & Gould]. Polsky has never had any physical contact with [the plaintiffs], and[,] in point of fact, Polsky's only contact in this matter was to make certain that the lawsuit which [Gould] filed on behalf of [the plaintiffs] against [Medeiros] was expeditiously carried forward in a competent manner. Also, [Gould and Polsky] agreed that any liabilities either might possess vis a vis their law practices, would be borne personally by each other; said liabilities having occurred prior to the date the partnership was formed, to wit, prior to October 1, 1992.

The plaintiffs, however, in their opposition, maintained that, shortly after the formation of Polsky & Gould, Polsky took over the representa-

tion of the plaintiffs and responsibility for the personal injury action filed by Gould on April 27, 1992. The motion for partial summary judgment was orally denied on May 20, 1993.

6. In their request for exemption from the court annexed arbitration program, filed on February 22, 1993, the plaintiffs indicated that Mrs. Thompson's medical and therapeutic treatment expenses were in excess of $34,000. They further stated that the jury verdict value was expected to be "substantially in excess of $150,000." The plaintiffs' request for exemption was granted the next day. Also, in their answering brief, filed on March 10, 2006, the plaintiffs maintain that Mrs. Thompson's medical bills have increased to $135,000 as a result of the accident.

7. On October 27, 1994, Medeiros filed a motion requesting the circuit court to sever the case against her from the instant action. Therein, Medeiros argued that it would be unfair to have her case decided simultaneously with the insurance case and professional malpractice case inasmuch as it would be "impossible as the case is presently structured for [Medeiros] to have this case decided without prejudicial information with regard to the issue of insurance and the amounts of coverage." Medeiros's motion was subsequently granted on January 6, 1995.

present fact" at the time the purported release was signed. The plaintiffs, therefore, maintained that they were entitled to rescind the 1991 release because of their and Gould's unilateral mistake as to Medeiros's policy limit. On December 19, 1994, the defendants filed their opposition to the plaintiffs' motion to rescind, contending that a unilateral mistake by the plaintiffs and/or the plaintiffs' attorney regarding the amount of available insurance coverage was not a valid basis to rescind the 1991 release.

At a hearing held on December 19, 1994, the parties stipulated that the motion to rescind would be treated as one for summary judgment. The parties further agreed that there was no dispute that, at the time the plaintiffs signed the 1991 release, the plaintiffs and Gould believed that the plaintiffs were receiving Medeiros's policy limit. The circuit court [8] determined that *Gossinger* was controlling and that the plaintiffs had made a unilateral mistake as to a "past or a present fact," thereby entitling them to rescission. The circuit court issued its written order granting the plaintiffs' motion for summary judgment on March 13, 1995 [hereinafter, the Summary Judgment Order].

### 3. The Settlement Agreement of the Rescission Action

On December 12, 1995, the plaintiffs, the defendants, the former attorneys, and Medeiros entered into a settlement agreement [hereinafter, the 1995 settlement agreement], wherein they agreed

to terminate, settle and compromise all claims and controversies, except as set forth herein, still existing between them as set forth more fully below:

NOW, THEREFORE, [the parties] mutually agree [that]:

1. The total value of [the plaintiffs'] claim for general damages as set forth in their First Amended Complaint is $135,000, a portion of which M[rs]. Thompson has received as follows:

a. On or about June 26, 1991, [the plaintiffs] received $35,000 from [the defendants] on behalf of [Medeiros].

b. On February 10, 1995, [the plaintiffs] received an additional $35,000 from [the defendants] on behalf of [Medeiros].

2. The current outstanding value of [the plaintiffs'] claims against [Medeiros] is $65,000, however, this amount shall only be due and owing to the [p]laintiffs under the following conditions:

a. [The defendants] shall appeal [the Summary Judgment Order].

b. If the Hawai'i State Supreme Court affirms [the Summary Judgment Order], then [the defendants] will pay, on behalf of [Medeiros], $65,000, general damages only, to [the plaintiffs].

c. If the Hawai'i State Supreme Court reverses [the Summary Judgment] Order ..., then a trial will be held solely on the issue of the validity of the [1991 r]elease.

1. If the trier of fact determines that the June 26, 1991 [release] is invalid, [the defendants] will pay, on behalf of [Medeiros], $65,000, general damages only, to [the plaintiffs].

2. If the trier of fact determines that the [1991 r]elease ... is valid, then there will be no further payment to [the plaintiffs].

3. [The former attorneys] agree to pay [the plaintiffs] the sum of $6,000. [The plaintiffs] acknowledge that $2,000 has already been received from [the former attorneys].

4. All claims of [the plaintiffs] against [the defendants] will be dismissed with prejudice except as to the validity of the [release] dated June 26, 1991.

In sum, all parties to the 1995 settlement agreement agreed that: (1) the total value of the plaintiffs' claim for general damages was $135,000; (2) the plaintiffs had been paid $70,000 by AIG on behalf of Medeiros; (3) the payment of the remaining $65,000 would be conditioned upon the appellate court's resolution of whether the plaintiffs were entitled to rescind the 1991 release; and (4) the former attorneys would pay the plaintiffs an additional $4,000, having already paid the plaintiffs $2,000.

---

8. The Honorable E. John McConnell presided over this matter.

Consequently, on March 24, 1995, the defendants filed a motion for certification, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (2004),[9] of the Summary Judgment Order. The circuit court entered judgment in favor of the plaintiffs on December 27, 1995.

### 4. Appeal Before the Intermediate Court of Appeals (ICA)

On January 9, 1996, the defendants timely filed their notice of appeal. This court, on two separate occasions, March 25 and September 3, 1996, dismissed the appeal for lack of jurisdiction because the circuit court's final judgment did not resolve all claims against all parties. On November 18, 1996, the circuit court entered an amended judgment. Thereafter, on December 9, 1996, the defendants filed their notice of appeal.

The defendants' appeal was subsequently assigned to the ICA. On September 29, 1997, the ICA, via a memorandum opinion, remanded the case to the circuit court with instructions for disposition. Specifically, the ICA disagreed with the circuit court's application of *Gossinger*, noting that:

In *Gossinger*, the court cited as a general rule that[,]

[i]f a claim is made for damages for an injury, a compromise settlement is ordinarily not made voidable for mistake because the injury was greater and lasted longer than was expected at the time of the settlement, if the parties knew or had reason to know that the extent of

the injury was uncertain and that was the very reason for the compromise.

... 73 Haw. at 420, 835 P.2d at 632 (quoting 6 A. Corbin, *Corbin on Contracts* § 1292 (1962)). However,

[i]n cases [where there is a mistake as to the extent or nature of injuries,] an important inquiry is whether the mistake relied upon in aid of cancellation related to a past or a present fact or related purely to a surmise or opinion as to the future development of a known and existing illness or injury. *If the mistake related clearly to a past or a present fact the remedy of cancellation will be awarded.*

*Id.* at 421–22, 835 P.2d at 632 [ (citation omitted) ] (emphasis added).

*Thus, Gossinger clearly applies to cases involving rescission of a settlement agreement based upon a mistake as to the nature or extent of injuries. However, based on the following, we hold that Gossinger does not apply to cases where the mistake is to the limits of an insurance policy.*

(Some brackets in original.) (Emphasis added.) The ICA concluded that the proper application is set forth in *AIG Hawai'i Insurance Co. v. Bateman*, 82 Hawai'i 453, 923 P.2d 395 (1996), wherein this court adopted the general principles of Restatement §§ 152, 153, and 154 regarding when a mistake is an appropriate basis for rescinding a settlement agreement.[10] *Id.* at 457–58, 923 P.2d at 399–400. Restatement § 153 states:

9.  HRCP Rule 54 provides in relevant part:

    (b) *Judgment upon multiple claims or involving multiple parties.* When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any ... form of decision ... which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties[.]

    (Emphasis in original.)

10. Specifically, the ICA stated that:

    In *Bateman*, Billy Bateman (Bateman) was driving a car owned by Flor Corpuz (Corpuz)

when he was involved in a motor vehicle accident with Pat Vicente (Vicente). AIG was Corpuz's automobile insurance carrier. AIG brought a declaratory action for a determination of whether it had a duty to defend Bateman because he was not a permissive user of the car and therefore not a "covered person." The circuit court denied such declaratory relief and AIG appealed. However, during the pendency of the appeal, AIG and Vicente agreed to settle Vicente's bodily injury claims against Bateman for the policy limits of $35,000. Thereafter, the supreme court held that Bateman was not a permissive user of the insured vehicle and therefore not a "covered person" under the insurance contract. *Id.* at 457, 923 P.2d at 724–25. As a result, AIG brought a subsequent action to rescind the settlement agreement with Vicente on the basis of a mutual mistake of law (*i.e.*, mistake on whether it

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, *the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154,* **and**

(a) *the effect of the mistake is such that enforcement of the contract would be unconscionable,* **or**

(b) *the other party had reason to know of the mistake or his fault caused the mistake.*

(Emphases added.) *See also Bateman,* 82 Hawai'i at 457, 923 P.2d at 399. In turn, section 154 provides:

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient; or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

*See also Bateman,* 82 Hawai'i at 458, 923 P.2d at 400.

In applying Restatement §§ 153 and 154, the ICA vacated the Summary Judgment Order and remanded the case to the circuit court with instructions that it determine whether the plaintiffs, "at the time the settlement agreement was made," had only limited

knowledge with respect to the limit of the liability policy. Specifically, the ICA stated:

The record on appeal does not sufficiently indicate the extent of [the p]laintiffs' knowledge with respect to the limits of the liability policy, and therein lies a genuine issue of material fact. As such, we remand the case for a determination of whether [the p]laintiffs bore the risk of mistake as to policy limits under subsection (b) [of Restatement § 154].

The ICA further indicated:

If [the p]laintiffs are ultimately found to have borne the risk of mistake under subsection (b), then they are precluded from rescinding the settlement agreement. If [the p]laintiffs are ultimately found to have not borne the risk of mistake under subsection (b), then [the p]laintiffs can rescind the settlement agreement only if there is a finding that (1) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (2) the other party had reason to know of the mistake or his or her fault caused the mistake.

None of the parties filed a motion for reconsideration of the ICA's opinion as permitted pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 40 (2004),[11] or an application for writ of certiorari, pursuant to HRAP Rule 40.1 (2004).[12]

### 5. Motion for Summary Judgment as to the Issue Whether the Release was Unconscionable

Upon remand to the circuit court, the plaintiffs, on January 28, 2002, filed a motion for summary judgment on the issue whether

---

had a duty to defend Bateman). *Although the court in Bateman was faced with a "mutual mistake of law" issue, it set forth the general principles on when mistake is a proper basis for rescinding a settlement agreement. Id. As such, the principles set forth in Bateman govern the immediate determination of whether a unilateral mistake of fact (i.e., mistake as to policy limits) can serve as a proper basis for rescinding the settlement agreement.*
(Emphasis added.)

11. HRAP Rule 40 provides in pertinent part:

(a) Time. A motion for reconsideration may be filed by a party only within 10 days after the filing of the opinion, dispositional order, or ruling unless by special leave additional time is

granted during such period by a judge or justice of the appellate court involved.
(Underscored emphasis in original.)

12. HRAP Rule 40.1 provided in relevant part:

(a) Application; when filed. No later than 30 days after the filing of an opinion, dispositional order, or rulings of the [ICA] ..., any party may apply in writing to the supreme court for a writ of certiorari to review such opinion, dispositional order, or ruling.
(Underscored emphasis in original.) Although not applicable to this case, the time period in which a writ of certiorari must be filed was later extended to ninety days. HRAP Rule 40.1 (2006).

the 1991 release was unconscionable, which is the basis of the instant appeal. The plaintiffs argued that, because

> [t]he parties ... stipulated [in the 1995 settlement agreement] that the value of the plaintiffs' claims is $135,000[,] as a matter of law, the $35,000 release, sought to be enforced by [the d]efendants, is unconscionable when the stipulated value of the claims is $135,000.

On February 19, 2002, the defendants filed their memorandum in opposition to the plaintiffs' motion. They maintained that unconscionability is determined "under the circumstances existing at the time of the making of the contract." (Quoting HRS § 490:2–302 cmt. 1) (Other citations omitted.) The defendants, therefore, asserted that the $35,000 consideration for the 1991 release was "not a nominal or unconscionable amount" in light of Mrs. Thompson's medical specials at the time of the execution of the 1991 release, which was $7,273.08. The defendants further argued that Long's testimony creates a genuine issue of material fact as to whether the 1991 release was unconscionable. As previously stated, Long testified that, when the 1991 release was executed, she reasonably believed that she had settled the plaintiffs' case for its "true value" in view of Mrs. Thompson's medical specials at the time.

A hearing was held on February 28, 2002, at which time the circuit court orally granted the plaintiffs' motion, indicating that:

> I'm going to grant the Motion for Summary Judgment on the issue of whether the [1991] release is unconscionable.
>
> I think that a claim—AIG claim agent that settles the case of $35,000 knowing that, you know, a Plaintiff is settling with her knowing that she's going elsewhere for underinsured when she knows AIG's policy limit is 300,000, smacks of unconscionability. And but for the fact that M[rs.] Thompson went and tried to get further damages from the underinsured policy, that's the only reason they learned that in fact AIG had a policy limit of [$]300,000, not [$]35,000.
>
> So I think—I think, given all of those circumstances, it appears to the court that

the [1991] release for $35,000 was unconscionable.

On March 13, 2002, the circuit court issued its written order [hereinafter, the rescission order], which stated that:

> IT IS HEREBY ORDERED that, in following the directives of the [ICA's] September 29, 1997 Memorandum Opinion herein, the court finds, as a matter of law, that it is unconscionable to enforce a Release of **personal injury claims** for $35,000 when the **stipulated value of those claims** is $135,000, and therefore, [the p]laintiffs' Motion for Summary Judgment on the Issue of Whether the [1991] Release is Unconscionable is **GRANTED**.

(Capitalization and bold emphasis in original.) (Underscored emphasis added.) The defendants, on March 22, 2002, filed a motion for reconsideration of the circuit court's rescission order. The defendants argued that the circuit court, at the hearing on the plaintiffs' motion, made a mistake of fact regarding whether AIG's claims adjustor, i.e., Long, knew prior to June 26, 1991, when the 1991 release was executed, that the plaintiffs or their counsel intended to make a UIM claim. The defendants attached to their motion Long's affidavit, wherein she attested that:

> 9. Gould never advised me orally or in writing that he intended to make a[ UIM] claim on behalf of [Mrs. Thompson] prior to June 26, 1991, when the release was executed. I never had any conversations with or received any correspondence from Fireman's Fund ... regarding [the] UIM claim until after September 20, 1991.
>
> 10. At no time prior to September 20, 1991 did I know that [the plaintiffs or] Gould intended to make a UIM claim against Fireman's Fund arising from the October 6, 1990 auto accident.
>
> 11. When I settled [Mrs. Thompson's] claim for $35,000 on June 26, 1991, I had no knowledge that Gould or [the plaintiffs] intended to make a UIM claim against Fireman's Fund. The first time I became aware that Gould or [the plaintiffs] intended to make a UIM claim against Fireman's Fund was on September 20, 1991, when I learned that Gould requested AIG's declaration sheet which indicated that [ ] Medei-

ros had $300,000 in [bodily injury] policy limits.

The plaintiffs, however, argued in their memorandum in opposition, filed on April 12, 2002, that the rescission order did not contain such finding or mistake of fact. They further reminded the circuit court of the ICA's memorandum opinion in which the ICA specifically remanded the case for the determination, *inter alia*, whether "the effect of the mistake is such that enforcement of the contract would be unconscionable," as mandated by Restatement § 153, and not whether the 1991 release was unconscionable at the time of its execution.

On April 23, 2002, the circuit court held a hearing on the defendants' motion, wherein the circuit court stated:

I have not heard any argument that gives me pause to change my mind as to my earlier ruling.

I hear that I may have been incorrect as to the defendant[s'] knowledge of [the] plaintiff[s'] intent to file an underinsured motorist action. I'm not convinced that AIG needs to be aware that they were planning to do that when they entered into the contract or the settlement.

*What I am faced with is that AIG, on this case, had a $300,000 policy limit. They offered $35,000, which [the] plaintiffs believed were the limits, and there was an acceptance, and I find for a case that has a stipulated value of [$135,000], that release was unconscionable, notwithstanding anybody's intent to go ahead later on and file for an underinsured motorist money.*

I also recall that there were dealings subsequent to the $35,000 acceptance in which AIG offered [$35,000] more, you know, and it seems to me that clearly that release was unconscionable at $35,000 under the circumstances.

Okay. So, I will stand by my decision and deny your motion for reconsideration.

(Emphases added.) The written order denying the defendants' motion for reconsideration was entered on May 24, 2002.

Prior to the issuance of the circuit court's May 24, 2002 order, the parties stipulated as to the plaintiffs' "limited knowledge," pursuant to Restatement § 154(b), on May 15, 2002. Specifically, the parties agreed that the plaintiffs did not sign the 1991 release with "limited knowledge" with respect to Medeiros's policy limit. Thus, in light of the ICA's September 29, 1997 memorandum opinion, all triable issues had been resolved. Consequently, the circuit court entered final judgment against the defendants on June 18, 2002.

On July 8, 2002, the defendants timely filed a notice of appeal from the June 18, 2002 judgment. This court, on October 11, 2002 and May 19, 2003, dismissed the defendants' appeal because the final judgment (1) failed to comply with HRCP Rule 58 (2004) [13] and (2) lacked specificity as to the claims that have been resolved and dismissed, respectively. On August 2, 2005, the circuit court filed an amended final judgment. Notice of entry of the amended final judgment was filed on August 16, 2005. The defendants then timely appealed.

## II. *STANDARDS OF REVIEW*

### A. *Summary Judgment*

"We review the circuit court's grant or denial of summary judgment *de novo.*" *Simmons v. Puu,* 105 Hawai'i 112, 117, 94 P.3d 667, 672 (2004) (quoting *Hawai'i Cmty. Fed. Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)). This court has noted that

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, to-

---

13. HRCP Rule 58 provides in relevant part:
When the court directs that a party recover only money or costs or that all relief be denied, the clerk shall enter judgment forthwith upon receipt by him of the direction; but when the court directs entry of judgment for other relief, the judge shall promptly settle or approve the form of the judgment and direct that it be

entered by the clerk. The filing of the judgment in the office of the clerk constitutes the entry of the judgment; and the judgment is not effective before such entry. The entry of the judgment shall not be delayed for the taxing of costs. Every judgment shall be set forth on a separate document.

gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Simmons,* 105 Hawai'i at 117–18, 94 P.3d at 672–73 (quoting *Kahale v. City & County of Honolulu,* 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004)).

B. *Rescission*

■ Rescission and cancellation are equitable remedies. The relief granted by a court in equity is discretionary and will not be overturned on review unless the circuit court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant.

*AIG Hawai'i Ins. Co. v. Bateman,* 82 Hawai'i 453, 456–57, 923 P.2d 395, 398–99 (1996) (citations, brackets, and internal quotation marks omitted).

### III. *DISCUSSION*

As previously stated, the sole issue before this court is whether the circuit court erred in determining, in the context of a motion for summary judgment, that the effect of the enforcement of the 1991 release would be, as a matter of law, unconscionable, thereby entitling the plaintiffs to rescission. The defendants contend that the circuit court erred because: (1) HRS § 490:2–302 dictates that unconscionability is determined under the circumstances existing when the contract was

made; and (2) there are genuine issues of material fact regarding whether the 1991 release was unconscionable. We address each of the defendants' contentions in turn.[14]

A. *Whether HRS § 490:2–302 Applies to the Instant Case*

■ The defendants contend that the circuit court failed to apply HRS § 490:2–302 inasmuch as it determined that the 1991 release was unconscionable—"not under the circumstances existing at the time, but rather under the circumstances existing years later," pointing to the 1995 settlement agreement, wherein the parties stipulated that the value of the plaintiffs' claims was $135,000.

HRS § 490:2–302, contained within the Uniform Commercial Code, provides:

**Unconscionable contract or clause.** (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made[,] the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable[,] the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

(Bold emphasis in original.) HRS § 490:1–103 (Supp.2005), however, provides in relevant part:

(a) This chapter shall be liberally construed and applied to promote its underlying purposes and policies, which are:

(1) To simplify, clarify, and modernize the law governing *commercial transactions;* [and]

---

14. We note that, inasmuch as the defendants failed to seek further review of the ICA's memorandum opinion by way of a motion for reconsideration or an application for writ of certiorari, we need not address the defendants' arguments challenging the ICA's holding or analysis. *See Ditto v. McCurdy,* 98 Hawai'i 123, 128, 44 P.3d

274, 279 (2002) (stating that "a determination of a question of law made by an appellate court in the course of an action becomes the law of the case and may not be disputed by a reopening of the question at a later stage of the litigation") (citation and internal quotation marks omitted).

(2) To permit the continued expansion of *commercial practices* through custom, usage, and agreement of the parties[.]

(Emphases added.) Moreover, HRS § 490:2–102 (1993) defines the scope of Article 2, entitled "Sales," within which HRS § 490:2–302 is located, to apply to

transactions in goods; [15] it does not apply to any transaction which[,] although in the form of an unconditional contract to sell or present sale[,] is intended to operate only as a security transaction[.]

Consequently, HRS § 490:2–302 is solely applicable to commercial transactions concerning the sale of goods, as the subject statute expressly provides that "the parties shall be afforded a reasonable opportunity to present evidence as to its *commercial setting*, purpose and effect to aid the court in making the determination" whether the contract or clause is unconscionable. HRS § 490:2–302(2) (emphasis added). Indeed, the instant case does not involve a commercial transaction relating to the sale of goods, and, therefore, HRS § 490:2–302 is inapplicable to the rescission of a release in a personal injury action. The defendants have not explained the reason that HRS § 490:2–302 is applicable to the execution of a personal injury release. Moreover, as the ICA concluded in its memorandum opinion, the proper test to determine whether rescission of a release is warranted is elaborated in Restatement §§ 152 (mutual mistake) and 153 (unilateral mistake), which this court adopted in *Bateman*, 82 Hawai'i at 457–58, 923 P.2d at 399–400. Accordingly, we hold that the circuit court did not err in declining to apply HRS § 490:2–302 in its determination whether the 1991 release was unconscionable.

### B. *Whether Genuine Issues of Material Fact Exist*

■ The defendants argue that the circuit court erred in granting summary judgment because genuine issues of material fact existed with respect to whether the 1991 release

was voidable based on unconscionability. Specifically, the defendants maintain that they

offered $35,000 believing this to be the fair and negotiated value of [Mrs. Thompson's] claim in light of her previous demand and extent of her injuries known at that time, June 26, 1991.

. . . [T]he evidence establishes that the June 26, 1991 release was not unconscionable. A $35,000 consideration for the [1991] release was not a nominal or unconscionable amount. It was *five times* more than [Mrs. Thompson's] medical specials as of June 26, 1991 ($7,273.08). There is no evidence [the p]laintiff[s were] pressured or improperly induced to settle her claim prematurely . . . .

(Parenthesis in original.) The evidence to which the defendants refer is Long's testimony that she believed the plaintiffs' personal injury action against Medeiros was settled for its "true value" in view of Mrs. Thompson's medical specials at the time. As such, the defendants contend that "[t]his testimony alone established, *ipso facto*, a genuine issue of material fact concerning whether the June 26, 1991 release was unconscionable." The defendants further maintain, as they did in their motion for reconsideration, that the circuit court's ruling contained a misstatement of fact regarding whether Long knew, prior to June 26, 1991, that the plaintiffs intended to make a UIM claim. The defendants argued that Long's affidavit, attached to their motion for reconsideration, clearly established that Long was not aware of the plaintiffs' intention to file a UIM claim.

As previously quoted, section 153 of the Restatement, entitled "When Mistake of One Party Makes the a Voidable," provides:

Where a mistake of one party **at the time a contract was made** as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to

---

**15.** "Goods" means

all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action.

"Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 490:2–107).

HRS § 490:2–105 (1993).

*him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154,* **and**

> (a) *the effect of the mistake is such that enforcement of the contract would be unconscionable,* or
>
> (b) the other party had reason to know of the mistake or his fault caused the mistake.

(Emphases added.) Section 154 explains that a party bears the risk of a mistake when:

> (a) the risk is allocated to him by agreement of the parties, or
>
> (b) *he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient;* or
>
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

(Emphasis added.) Inasmuch as the ICA's holding is law of the case, *see supra* note 14, the issues central to the determination whether the 1991 release was voidable, as announced by the ICA and contained within Restatement §§ 153 and 154, are: (1) whether the plaintiffs executed the 1991 release with "limited knowledge" that they "treat[ed] as sufficient" such that they should bear the risk of mistake, Restatement § 154(b); and, (2) if not, whether the effect of enforcement of the 1991 release would be unconscionable, Restatement § 153(a).

### 1. Plaintiffs' Limited Knowledge

As previously stated, the plaintiffs executed the 1991 release based upon Gould's representation that Long had informed him that the $35,000 offer to settle represented the entirety of Medeiros's liability insurance coverage, when, in fact, the policy limit was $300,000. Gould, however, never inquired or confirmed—either by direct oral or written inquiry to Long or via interrogatories directed to the defendants as permitted under available discovery rules—the policy limit of Medeiros's liability insurance. Rather, Gould assumed Long's representations, made during his negotiations with her, meant that the $35,000 offer was, in fact, the policy limit.

*See* Restatement § 154, cmt. a (indicating that a party "may be barred from avoidance [of the contract] if the mistake was the result of his failure to act in good faith and in accordance with reasonable standards of fair dealing"). Nevertheless, the parties, on May 15, 2002, stipulated that the plaintiffs did *not* have limited knowledge as to Medeiros's policy limit when they signed the 1991 release and, thus, did not bear the risk of mistake. Consequently, for purposes of our analysis, we accept the parties' stipulation and focus our attention on the application of Restatement § 153, *i.e.*, whether a mistake of one party, at the time of the contract, as to a basic assumption on which the party made the contract has a material adverse effect such that enforcement of the contract would be unconscionable.

### 2. Unconscionability

As previously stated, the parties agreed in the 1995 settlement agreement that the value of the plaintiffs' claims was $135,000. They also stipulated, on May 15, 2002, that the plaintiffs did not have limited knowledge as to Medeiros's policy limit at the time they entered into the 1991 release. Based upon the foregoing stipulations, the circuit court concluded that the effect of enforcing a $35,000 release, executed by the parties on June 26, 1991, would be unconscionable in light of the stipulated value of $135,000. We cannot agree, however, with the circuit court's reliance upon the $135,000 stipulated value for two reasons: (1) the requirements of section 153 of the Restatement; and (2) the stipulated value appears to assess the combined value of the claims arising out of the personal injury and the rescission actions.

As previously quoted, Restatement § 153 expressly authorizes a party to void a contract where that party's mistake "*at the time a contract was made ... has a material effect on the agreed exchange of performances that is adverse to him,*" (emphasis added), such that, *inter alia*, the enforcement of the contract would be unconscionable. By its plain language, the proper determination is whether, at the time the contract was made—in this case, 1991—and in light of the

unilateral mistake, the enforcement of the contract, *i.e.*, the release, would be unconscionable. The dispositive question, then, is whether the $135,000 stipulated value represents the value of plaintiffs' personal injury claim in 1991.

In the instant case, the parties agreed in the 1995 settlement agreement that "the total value of [the plaintiffs'] claims for general damages *as set forth in their First Amended Complaint* is $135,000[.]" (Emphasis added.) The aforementioned sentence is preceded by a paragraph describing the plaintiffs' complaint as seeking damages against the defendants, the former attorneys, and Medeiros for

> intentional infliction of emotional distress; negligent infliction of emotional distress; unfair and deceptive acts or practices in violation of HRS Sections 480–2 through 480–13; negligent misrepresentation; fraud; unfair practices; breach of fiduciary duties and exemplary and punitive damages [ (collectively, the rescission claims) ] *or damages arising out of [Mrs. Thompson's] October 6, 1990 automobile accident with Josephine Medeiros and/or the settlement negotiations with [the defendants] which took place subsequent thereto.*

(Emphases added.) The above-quoted paragraph is then followed by a sentence indicating the parties' "desire to terminate, settle and compromise *all claims and controversies*, except as set forth herein, still existing between them as set forth more fully below [ (*i.e.*, the appeal regarding the grant of plaintiffs' motion to rescind and for summary judgment).]" (Emphasis added.)

Based upon the plain language of the 1995 settlement agreement, "all claims and controversies" include not only the rescission claims but also the personal injury claim. It follows then that the $135,000 value represents "the *total* value of [the plaintiffs'] claim for general damages as set forth in the First Amended Complaint" (emphasis added), *i.e.*, the rescission action, and seemingly the "damages arising out of [the personal injury action] *and/or* the settlement negotiations with [the defendants regarding the personal injury action]." (Emphasis added.) Thus, in our view, there is a genuine issue of material fact as to

whether the stipulated value represents only the value of plaintiffs' personal injury claim or includes the value of both the personal injury claim and the rescission claims. Moreover, even if we were to assume that it represents only the personal injury claim, there is also a genuine issue of material fact whether the $135,000 assessment represents the value *at the time* the parties entered into the 1991 release, as required by section 153 of the Restatement. Accordingly, we hold that the circuit court erred in relying upon the 1995–stipulated value to conclude that the 1991 release was unconscionable and in granting summary judgment in favor of the plaintiffs.

## IV. CONCLUSION

Based on the foregoing, we vacate the circuit court's August 2, 2005 amended final judgment and remand this case for further proceedings consistent with this opinion.

