Concurring and Dissenting Opinion by
Circuit Judge CHANG.
I.
INTRODUCTION
I respectfully concur[1] and dissent because I am unable to agree with the expansion of Hawaii’s bad faith law from a contract based cause of action to include relationship based causes of action. Additionally, today’s decision to expose a Joint Underwriting Plan[2] [hereinafter “JUP”] servicing carrier to bad faith liability is a policy question that should *498 be deferred to the legislature, particularly in light of the decision’s far-reaching implications.
Therefore, I would affirm the ICA and note, in the opinion of the court, the wisdom of imposing a duty of good faith and fair dealing upon the servicing carrier, if that be the legislature’s intent. This would obviate the need to expand Hawai'i bad faith law, thereby avoiding the potential for creating broad and onerous extra-contractual liability implications for those in statutorily created relationships.[3]
My views diverge from the majority on two key issues: (1) whether Hawai'i should recognize a bad faith cause of action where no actual contract between the parties exists and (2) whether establishing the policy of recognizing bad faith causes of action in the context of statutorily created relationships should be left to the legislature. These issues will be discussed seriatim.
II.
NO BASIS FOR BAD FAITH
It is clear that when Hawai'i first recognized a cause of action for bad faith in the first-party insurance context[4], that claim was based upon the seminal principle that the duty of good faith and fair dealing is implied in a contract of insurance. This principle forms the bedrock of the bad faith claim because it is the implied duty of good faith and fair dealing that breathes life into a bad faith claim.[5]
Instead of adhering to this seminal principle, today’s decision expands the bad faith cause of action beyond the traditional confines of contractual relationships[6] and can now arise out of statutorily created relationships.[7] The instant landmark decision is not consistent with existing Hawai'i case law.
*499 This court has expressly concluded in the past that an assigned claim is a statutory claim that does not arise out of a contract.
Assigned claims are creatures of statute and do not arise out of a contractual relationship ....
Furthermore, whereas the legislature enunciated that a certificate policy “shall be deemed a policy for the purposes of [the Insurance Code, HRS c. Ch. 431],” the legislature did not similarly categorize assigned claims. Compare HRS 431:10C-407(b)(2) (concerning certificate policies), ... with HRS § 431:10C-408 (concerning assigned claims).
Willis v. Swain, 113 Hawai'i 246, 249-50,151 P.3d 727, 730-31 (2006)(emphasis added) (hereinafter referred to as “Willis II ”).
There is nothing in the Willis II analysis to suggest that the court’s above-quoted understanding of an “assigned claim” is limited to attorneys’ fees purposes. Id. In fact, the Willis II court appears to have stated, without equivocation, qualification, or limitation, that an “assigned claim” is a creature of statute and not of contract. Without a contract, the law recognizes no basis for implying a duty of good faith and fair dealing and any error or malfeasance associated with an assigned claim should not give rise to a bad faith claim under the current state of the JUP law.
Since there was no actual contract of insurance between the parties herein, the majority examined other JUP statutory language. A central pillar of the majority’s analysis is the language of HRS § 431:100-403, which states in relevant part:
§ 431:100-403 Bureau’s duties. The bureau shall promptly assign each claim and application, and notify the claimant or applicant of the identity and address of the assignee of the claim or application. Claims and applications shall be assigned so as to minimize inconvenience to claimants and applicants. The assignee, thereafter, has rights and obligations as if it had issued motor vehicle mandatory public liability and property damage policies complying with this article applicable to the accidental harm or other damage, or, in the case of financial inability of a motor vehicle insurer or self-insurer to perform its obligations, as if the assignee had written the applicable motor vehicle insurance policy, undertaken the self-insurance, or lawfully obligated itself to pay motor vehicle insurance benefits.
Haw.Rev.Stat. § 431:10C-403 (2005 Replaeement)(emphasis added).
The majority relied in large part upon the above-quoted italicized language of § 403. However, it is the language that precedes the italicized language that actually clarifies the meaning of the italicized language.
The language that precedes the italicized language makes it clear that § 403 is not focused upon extra-contractual implied duties of good faith and fair dealing. Instead, what § 403 addresses is the duty of the servicing earner to administer the JUP claim; ie., to administer, investigate, process, and pay or deny the claim.
This section begins with a description of the JUP bureau’s duties. Section 403 provides that the bureau shall promptly assign and notify the claimant of the assignment. Further, the bureau must minimize inconvenience to the claimant. After the bureau has completed these tasks, the assignee servicing carrier then has the “rights and obligations as if it had issued motor vehicle ... policies ....” Id.
In the context of the entire § 403, the italicized language means that the servicing carrier must administer the JUP claim as if it had issued an insurance policy that provided JUP benefits. The majority interprets the italicized language of § 403 as expressing *500 the legislative intent that the servicing carrier has a duty of good faith and fair dealing, notwithstanding that there is no actual contract of insurance from which to imply such a duty. This is a leap in which I am unable to join the majority.
The dissent is also consistent with the JUP provisions relating to a certificate policy and relevant case law. A person who qualifies under JUP for personal injury protection (no-fault) benefits is required to obtain a certificate from the Department of Human Services regarding that person’s status as a public assistance recipient. That certificate is expressly deemed to be a policy contract for no-fault purposes:
A certificate shall be issued by the departs ment of human services indicating that the person is a bona fide public assistance recipient.... The certificate shall be deemed a policy for the purposes of this chapter upon the issuance of a valid motor vehicle insurance identification card....
Id. § 431:10C-407(b)(2)(B) (emphasis added).
Unlike the certificate policy (which is statutorily deemed to be a “policy”), the statutory provisions governing the assigned claim does not have any comparable language that deems an assigned claim to be a policy. This distinction between a certificate policy (i.e., a contract) and an assigned claim (¿a, no contract) was recognized in Willis II, 113 Hawai'i at 249-50, 151 P.3d at 730-31.
The majority appears to equate the certificate policy with assigned claims for the purposes of bad faith claims. However, with respect to a claim for bad faith, a certificate policy and an assigned claim differ in one significant way: a certificate policy is expressly deemed to be a policy (i.e., a contract) but assigned claims are not. Therefore, I am unable to agree with the proposition that the JUP statutory scheme treats a certificate policy and an assigned claim equally in terms of whether either is a contract.
The majority concludes that the legislature made a public policy decision to impose a duty of good faith and fair dealing upon insurers handling assigned claims. If the legislature did, in fact, make such a public policy decision, it would have reflected such a decision by expressly deeming an assigned claim to be a policy. It did not.[8]
It is significant that the legislature chose not to deem an assigned claim to be a contract, particularly in light of the fact that § 403 (assigned claims) and § 407(b)(2)(B) (certificate policy) are juxtaposed in such close proximity. The distinction appears to be a deliberate choice rather than oversight.
Another consideration that is relevant to the question of legislative intent is that certificate policy holders are all public assistance eligible. As such, they would, generally speaking, have less resources available to raise a bad faith challenge. As a result, certificate policy holders would have a tendency to be a more vulnerable population. That population would benefit greatly from the protections afforded by a duty of good faith and faire dealing being imposed by implication upon the insurance carrier.
However, assigned claimants are not necessarily persons who are public assistance eligible. In fact, some assigned claimants may have an abundance of resources at their disposal. Therefore, assigned claimants may not, as a population, be as vulnerable or lacking in resources to raise a bad faith challenge. Hence, there may be a reduced need to protect assigned claimants. Therefore, the legislature may very well have made a deliberate and conscious choice of the precise language of § 403 so as to avoid imposing by implication the duty of good faith and fair dealing upon a servicing carrier.[9]
*501 In any event, there are numerous reasons discussed throughout this dissent why I find it difficult to reach the conclusion that the legislature decided to impose a duty of good faith and fair dealing upon a servicing carrier. Indeed, it is unsettling that the road to the conclusion that the legislature intended to impose a duty of good faith upon a servicing carrier is riddled with contrary considerations.[10]
The majority also relies in part upon a trio of Hawai'i cases in rejecting the conclusion that a contract is a prerequisite for a bad faith claim. It is respectfully submitted that our decision’s reliance upon those three cases is subject to debate.
The first of the three cases is Simmons v. Puu, 105 Hawai'i 112, 94 P.3d 667 (2004). The Simmons court held “that any formal recognition of a claim for relief in favor of an injured claimant against a third-party tort-feasor’s insurance company for bad faith settlement practices would require the assignment [a contract] of the insured tortfeasor’s rights arising from an underlying insurance contract to the injured plaintiff.” Id. at 122-23, 94 P.3d at 677-78. The Simmons court acknowledged that no other jurisdiction has recognized a bad faith cause of action without *502 a contract, or an assignment of contractual rights, from which the covenant of good faith and fair dealing is implied.[11] Id. at 121-22, 94 P.3d at 676-77.
The majority contrasts the holding in Simmons with the case at bar as follows:
Here, in contrast, as an assigned claimant, Petitioner stands in a first-party relationship to Respondent.
The assigned claims plan under JUP creates an insurer-insured relationship, and no underlying contract is necessary to give rise to that relationship and its concomitant rights and obligations because that relationship is created by statute.
Majority opinion at 28-29.
Recognizing a bad faith claim without the necessity of an underlying contract is a profound departure from fundamental common law principles that spawned bad faith law. We are aware of no jurisdiction that has recognized the proposition that a covenant of good faith and fair dealing can be implied in a statutorily created relationship without an underlying contract.
This court noted in the past that the good faith duty does not arise out of just any relationship, but out of a “relationship established by contract.” See note 6, supra (emphasis added). The reason why a contract is necessary is because the foundation upon which the bad faith tort cause of action rests is the common law principle that a covenant of good faith and fair dealing is implied by law in a contract of insurance. Best Place, Inc. v. Penn America Insurance Co., 82 Hawai'i 120,123-24, 920 P.2d 334, 337-38 (1996). There is no comparable common law principle with regard to a non-contract based relationship. Therefore, in order for a relationship to support the implication of a duty of good faith, that relationship must be established by a contract, not by statute. Otherwise, there is no common law basis for implying a covenant of good faith and fair dealing. The unmistakable principle in Simmons is that a contract is a “necessary element” of a bad faith cause of action because the existence of a contract is the “analytical underpinning of this court’s adoption of the [bad faith cause of action] in the first place.”[12] Simmons is controlling and contrary to our decision today.
The second of the three cases is Enoka v. AIG Hawaii Insurance Company, Inc., 109 *503 Hawai'i 537, 128 P.3d 850 (2006). Today’s decision construes Enoka as supporting the proposition that a bad faith cause of action is not dependent upon the existence of a contract. The majority states with regard to Enoka that “this court held that the tort of bad faith did not turn on whether the claim for benefits was due or not; instead, it turned on ‘the conduct of the insurance company in handling the claim.’ ” Majority opinion at 31. The majority goes on to state that the “special relationship between the insurer and the insured and the conduct of the insurer toward the insured is what gives rise to the tort of bad faith, not solely the existence of a contract.”[13] Id.
Where I differ in my reading of Enoka is that the principle for which Enoka stands is that the basis for determining whether the insurer committed bad faith does not depend upon whether the insurer breached the in- *504 suranee contract. Instead, bad faith looks beyond the four corners of the insurance contract to the conduct of the insurer in discharging its duty of good faith that is implied in the insurance contract.
Enoka focused upon whether there can be a breach of the covenant of good faith that is implied in an insurance contract if there is no coverage under the insurance policy. Stated differently, is a bad faith plaintiff still entitled to pursue a bad faith claim if the bad faith plaintiffs claim for insurance benefits is found to be excluded from coverage under the insurance policy? Enoka held:
Inasmuch as Enoka has alleged that AIG handled the denial of her claim for no-fault benefits in bad faith, we conclude that she is not precluded from bringing her bad faith claim even where there is no coverage liability on the underlying policy. Accordingly, we hold that the trial court erred in determining that, because Enoka’s breach of the contract claim failed, her bad faith claim must fail.
Enoka v. AIG Hawaii Insurance Co., Inc., 109 Hawai'i 537, 552, 128 P.3d 850, 865 (2006).
Enoka addressed whether a bad faith claim can be maintained if the underlying claim is denied or not paid when it stated: “However, as explained by the Hawaii Supreme Court in Best Place, a claim for the tort of bad faith does not turn on whether the claim for benefits was due or not, instead it turns on the conduct of the insurance company in handling the claim.” Id. at 551, 128 P.3d at 864. Enoka really does not appear to address at all whether a covenant of good faith and fair dealing can be implied in a statutorily created relationship without a contract.
Enoka was published several years after Best Place and its progeny. Therefore, bad faith law was firmly established in Hawaii by the time Enoka was decided. As such, Eno-ka did not engage in any discussion regarding whether a covenant of good faith can be implied in a relationship where no contract of insurance exists. Moreover, no such discussion was implicated by the facts of that ease since the AIG insurance policy was the contract from which the duty of good faith was implied.
The third of the three cases is Christiansen v. First Insurance Company of Hawaii, Ltd., 88 Hawai'i 442, 967 P.2d 639 (App.1998). I agree with the majority that the teachings of Christiansen are similar to those of Eno-ka. As such, Christiansen also does not appear to suggest that the existence of a contract is not a prerequisite to a bad faith claim.
When the Christiansen court stated that “an insurer’s duty of good faith and fair dealing as one implied by law that is ‘independent of the performance of [the insured’s] contractual obligations[,]’” id. at 451, 967 P.2d at 648 (quoting Best Place, Inc. v. Penn America Insurance Co., 82 Hawai'i 120, 128, 920 P.2d 334, 342 (1996)), it did not mean to suggest that the good faith duty can be implied by law in a relationship without a contract. On the contrary, Christiansen, like Enoka, involved an insurance contract from which the duty of good faith was implied.
The Christiansen court’s reference to “implied by law” in the above-quoted language was a reference to the common law principle that a covenant of good faith and fair dealing is implied in an insurance contract. It was not a reference or implication that a duty of good faith can be implied in a relationship in the absence of a contract.
A similar observation can be made of the Christiansen court’s statement that “a tort of bad faith is a tort independent of the policy because its origins are not in the contract but in the common law imposition of good faith and fair dealing, the breach of which fiduciary dirty may be considered an independent tort.” Id. at 452, 967 P.2d at 649.
The context of the quoted language is that the Christiansen court was faced with the question whether a bad faith tort claim was subject to the one year statute of limitations stated in the underlying insurance policy or the two year statute of limitations that applied generally to all tort actions. The bad faith complaint in Christiansen was filed six months after the expiration of the one year statute of limitation and six months before *505 the expiration of the two year statute of limitation.
Again, Christiansen involved a contract of insurance. Thus, when the Christiansen court used phrases such as a bad faith tort is “independent of the policy” or that bad faith “origins are not in the contract but in the common law imposition of good faith and fair dealing,” the court did not intend such language to suggest that a covenant of good faith and fair dealing can be implied in the absence of a contract.
When read in the context of deciding which statute of limitations applied, the Christian-sen court’s usage of phrases such as “independent of the policy” and “origins not in the contract but in the common law” were really addressing the same issue that was before Enoka: Whether the bad faith claim is subject to the provisions of the underlying insurance policy or whether the bad faith claims implicate duties that are broader than the four corners of the insurance contract. Christiansen and Enoka both held that the bad faith claim is based upon the implied covenant of good faith and fair dealing, which is separate and distinct from the duties that are established by the express provisions of the insurance policy.
It is equally apparent that neither the Christiansen nor the Enoka courts espoused the principle that a covenant of good faith and fair dealing can be implied in the absence of a contract.[14] Christiansen involved a First Insurance insurance policy and Eno-ka involved an AIG insurance policy. The facts in both cases did not raise an issue regarding whether a good faith duty can be implied in the absence of a contract. Therefore, to interpret the quoted language from Christiansen as suggesting support for the proposition that a duty of good faith can be implied without a contract does not appear to be consistent with the essence of Christian-sen.
Based upon the foregoing, I respectfully conclude that the statutory scheme for assigned claims does not impose a covenant of good faith and fair dealing upon the servicing carrier because there is no contract of insurance between the assigned claimant and the servicing carrier. If there is no contract between the parties, there is no basis for implying a covenant of good faith and fair dealing.
III.
POLICY MAKING SHOULD BE DEFERRED TO LEGISLATURE
[T]his court has said that “the power to decide what the policy of the law shall be resides with the legislature; ‘and if it has intimated its will, ... that will should be recognized and obeyed.’ ”
Washington v. Fireman’s Fund Insurance Cos., 68 Haw. 192, 200-01, 708 P.2d 129, 135 (1985). Accord, In re Bowler, 9 Haw. 171, 176 (1893) (“It is not for [the Supreme Court of the Hawaiian Islands] to inquire into the policy or wisdom of such a law. That rests solely with the legislative body.”).
The decision to recognize that a bad faith cause of action can arise out of a statutorily created relationship is a policy question that is more appropriately addressed to the legislature. There are vast implications of such a policy that a law making process is better suited to vet with greater representation and participation by members of the effected population.[15]
*506 For example, the interests of representatives of the overwhelming majority of the statutorily created relationships[16] were not represented in the instant appeal. Only one such entity was represented herein and that was the Petitioner. Neither Petitioner nor Respondent appeared to speak for or on behalf of the multitude of other persons or entities in statutorily created relationships. If the question decided today were presented to the legislature, all interested segments of our society would have the opportunity to be heard on the question of adopting the policy that is established by our decision.
The government and the private sector have a multitude of persons in statutorily created relationships that may potentially be exposed to bad faith liability as a result of our decision in this ease. It is precisely for this reason that the policy decision made today should be deferred to the legislature.
I do not quarrel with the wisdom of the majority. I simply and respectfully view the policy question decided today, and its potentially broad implications, as matters that should be left to the legislature.[17]
If deferred to the legislature, the question of whether to expose servicing carriers to bad faith liability could be accomplished very surgically, without potentially exposing so many others in statutorily created relationships to bad faith liability. The legislature could accomplish this simply by amending HRS § 431:100-403 (assigned claims) to provide that assigned claims rights and obligations of the servicing carrier “shall be deemed a policy for the purposes of this chapter.” The legislature has already done this with the certificate policy.[18]
If the legislature were to enact such an amendment, it would supersede prior inconsistent case law[19], clearly and intentionally support the existence of a claim for bad faith by establishing a well-recognized basis (¿e., a contract) for implying a duty of good faith and fair dealing, and obviate the need to expand bad faith law in such a novel and far-reaching manner as was necessary to achieve the result herein. A fundamental principle of the duty of good faith and fair dealing, which only arises out of a contract, would remain intact and all other statutorily created relationships would remain free from the specter of bad faith.
IV.
CONCLUSION
I do not quarrel with the wisdom of the majority. I respectfully posit a more conservative perspective that would maintain the bad faith cause of action in its status quo and, given the potential implications of today’s decision, defer to the legislature the policy issue of recognizing a bad faith claim in the context of assigned claims.
I share in the concern of the majority that a servicing carrier appears to have little incentive to deal with an assigned claim in good faith and with fair dealing.[20] Often, the *507 assigned claim applicant has a vastly unequal capacity to challenge the servicing carrier’s claims management and decisions. There appears to be great wisdom and social justice in imposing duties of good faith and fair dealing upon a servicing carrier; a standard to which many servicing earners already adhere. However, I think it preferable to have the legislature address this policy question rather than having this court take the steps that were necessary for the judiciary to address the policy question decided today.

. I agree with the majority that there is great wisdom in imposing a duty of good faith and fair dealing upon a JUP servicing carrier. Otherwise, there is very little incentive built into the JUP for the servicing carrier to discharge its duties and responsibilities under the JUP in good faith and with fair dealing. The servicing carrier makes no profit from JUP business, the JUP beneficiary/claimant pays no premium, there is no formal contract between the servicing carrier and the HJUP beneficiary/claimant, and administering and adjusting the JUP assigned claim consumes resources of the servicing carrier with little or no pecuniary return. Therefore, I concur with the majority’s discussion regarding the need for adopting a policy to support a JUP claimant. This statement should not be construed as a finding or a suggestion that the Respondent servicing carrier herein did, in fact, engage in any bad faith or other improper conduct. I make no such finding or suggestion, since such ultimate issues are clearly beyond the scope of the instant appeal.

. The Hawai'i Joint Underwriting Plan ["JUP”] requires all motor vehicle insurance carriers who are authorized to do business in Hawai'i to participate in the Plan. There are two aspects of the JUP that are relevant to the instant case. First is the "no-fault certificate” that is governed by HRS § 431:10C-407(b)(2). The "no-fault certificate” is essentially a no-fault or personal injury protection policy for persons who are receiving certain public assistance benefits. Second is the "assigned claim," which is governed by HRS § 431:10C-408. An "assigned claim” beneficiary or recipient is not necessarily a person who receives public assistance benefits. Any person, whether or not on public assistance, may qualify to apply for "assigned claims" benefits whenever such person is injured in a motor vehicle accident where no liability insurance is applicable. Subsequent to the subject accident, the legislature amended HRS § 431:10C-408(a)(1) to include "uninsured motorist insurance” in addition to "liability insurance” in determining who may qualify to receive "assigned claims” benefits.

. May I state unequivocally that I am not suggesting, stating, or implying that the majority does intend today’s decision to have any application to any statutorily created relationship other than the relationship between assigned claimants and their servicing carriers. However, I am certain that zealous advocates will be urging Ha-wai'i courts to extend today's ruling to a wide variety of statutorily created relationships other than that which exists between assigned claimants and their servicing carriers. It is such an evolution of today’s decision that concerns me the most. This is the primary reason why I respectfully take the position, in Part III, infra, that the matter of whether an assigned claim is or is not a contract or deemed to be a contract should be deferred to the legislature. While the majority did clarify in footnote 13 its intent that today's opinion relates only to no-fault insurance provisions, I am not sure that a zealous advocate pursuing an extension of the law or a new appellate court will be deterred by that.

. The landmark case in Hawai'i that first recognized a bad faith cause of action in the first party insurance context in Best Place Inc. v. Penn America Insurance Co., 82 Hawai'i 120, 920 P.2d 334(1996).

. "The cornerstone of the decisions in [early bad faith decisions] is that, in every contract there is an implied covenant of good faith and fair dealing." Best Place Inc. v. Penn America Insurance Co., 82 Hawai'i 120, 124, 920 P.2d 334, 338 (1996). "Accordingly, we hold that there is a legal duty implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action.” Id. at 132, 920 P.2d at 346.

. The parties have not cited to a single case from any jurisdiction that recognized a bad faith cause of action based upon a statutory relationship without a contract. Every case that recognized a bad faith cause of action involved a contract between the parties. E.g., Best Place Inc. v. Penn America Insurance Co., 82 Hawai'i 120, 920 P.2d 334 (1996); Simmons v. Puu, 105 Hawai'i 112, 94 P.3d 667 (2004); Enoka v. AIG Hawaii Insurance Company, Inc., 109 Hawai'i 537, 128 P.3d 850 (2006); Christiansen v. First Insurance Company of Hawaii, Ltd., 88 Hawai'i 442, 967 P.2d 639 (App.1998). The reason for this is that the law recognizes that the implied covenant of good faith and fair dealing arises out of a contract between the parties and not out of the relationship between the parties in the absence of a contract.

. The salient language from Best Place upon which the majority appears to rely is that bad faith is not merely a tortious breach of contract, "but rather a separate and distinct wrong 'which results from the breach of a duty imposed as a consequence of the relationship established by contract.' ” Best Place Inc. v. Penn America Insurance Co., 82 Hawai'i 120, 131-32, 920 P.2d 334, 345-46 (1996)(emphasis added). The majority focused upon the word "relationship” in the above-quoted language from Best Place as the touchstone for the expanded bad faith claim that can now be triggered in a statutorily created relationship. However, this focus upon the word "relationship” expands the bad faith cause of *499 action beyond that which Best Place appears to contemplate. The "relationship” that warrants protection by a bad faith cause of action is a relationship that is "established by a contract,” not by a statute. Best Place did not contemplate a bad faith causes of action that arises out of a statutorily created relationship because no jurisdiction (including Hawai'i) had recognized such a claim until the case at bar. Therefore, Best Place is consistent with the universal notion that a bad faith cause of action is only recognized where the duty of good faith and fair dealing is implied in a contract between the parties. The majority’s reliance only upon the word "relationship,” without the rest of that phrase, appears to be misplaced.

. The majority's footnote 17 clarifies that policy-making is not involved in its decision today. The dissent respectfully submits that when (1) the legislature creates two statutory programs (one for certificate policies and one for assigned claims), (2) the legislature expressly deems a certificate policy to be a policy (i.e., a contract), (3) the legislature does not expressly deem an assigned claim to involve a contract, (4) enormous legal implications in the insurance context involving bad faith duties that arise out of a contract of insurance, and (5) the majority interprets the assigned claim statute to be deemed a policy or contract, policy-making is likely involved in this decision.

. The majority concludes at footnote 20 that it would be "an anomaly” to extend bad faith protections to a certificate policy claimant and not to assigned claimants. The use of the word *501 “anomaly" is interesting because an "anomaly” is typically defined as a deviation from normal or common order, form, or rule. The American Heritage Dictionary of the English Language 54 (1979). It could be argued that, prior to today’s decision, the normal or common order with respect to the law on bad faith in Hawai'i was to limit such causes of action to circumstances where an actual contract existed between the parties. That was because there was no bad faith cause of action unless a duty of good faith and fair dealing first existed. And, that duty could not be conjured up without the existence of an actual host contract out of which the law could imply a covenant of good faith and fair dealing. Best Place Inc. v. Penn America Insurance Co., 82 Hawai'i 120, 920 P.2d 334 (1996). That was the state of the law until today. There is no question that the legislature expressly deemed a certificate policy to be a "policy” (i.e., an actual contract). It is further without question that the legislature did not expressly deem assigned claim benefits to arise out of any contract. Therefore, one could conclude that, as between a certificate policy and an assigned claim, there is a contractual basis to imply a covenant of good faith and fair dealing in a certificate policy situation, but not in an assigned claim situation. That is the point of the dissent. As such, the analysis of the dissent may, therefore, represent the normal or common order, rather than the anomaly.
Finally with respect to footnote 20, the dissent did not advance "the idea that assigned claimants do not need protection....” Majority at footnote 20. In fact, the dissent agreed with the majority with respect to the need for protection of assigned claimants. See dissent at footnote 1. When read in its proper context, pages 8 and 9 of the dissent, instead, explains that the need to protect assigned claimants (as a population) may be less than that of certificate policy holders, not non-existent.

. The majority goes through a wonderful discussion and analysis in Section IX of its opinion comparing and contrasting the certificate policy program and the assigned claim program. Then, without an explanation, the majority leaps from the end of Section IX to the conclusion in footnote 19 that HRS § 431:100-403 “deems” an assigned claim to be treated as a motor vehicle policy. The dissent agrees with the majority's discussion in Section IX that the certificate policy program and the assigned claim program are different programs with different intents. The certificate policy was created to get public assistance recipients driving on the road in a financially responsible fashion. On the other hand, the assigned claim program was designed as a program of last resort to afford persons harmed in motor vehicle accidents to receive minimum, basic payments if no other insurance is available. The dissent is struggling to see how the magnani-mousness of the state, in affording last resort payment under the assigned claim program, can be construed as an intent to impose upon a servicing carrier a duty of good faith and fair dealing in favor of the assigned claimant. Other remedies may be available to a mistreated assigned claimant (e.g., tort claims, unfair business practices, etc.). But, today's decision goes beyond the comfort level of the dissent’s capacity to agree that the legislature intended the assigned claim to arise out of a contract, so as to give rise to duties of good faith and fair dealing, which heretofore, were only implied from an actual contract. It seems to me, particularly after reading the applicable statutes and Section IX of the majority opinion, that it is clear that the legislature only intended to create a last resort program for assigned claimants, and nothing more. The express language of the assigned claim statute could not be any clearer. Creating any more implied benefits or remedies for an assigned claimant, such as a bad faith claim against the servicing carrier, is a policy decision that the legislature should make, not this esteemed court. There is no express language in the assigned claim context, such as is present in the certificate policy context, that indicates that the legislature intended to expose servicing insurance carriers with bad faith liability in the assigned claim context.

. The majority states in footnote 24 that 'Ttlhe dissent incorrectly claims that good faith cannot be implied 'without an underlying contract.' ” To be clear, the dissent's view is based upon the principle that the assigned claim statute, in the absence of an express recognition by the legislature of the existence of an assigned claim contract, cannot constitute the sine qua non for a bad faith claim: an actual contract. It is the existence of a contract between the parties, from which the covenant of good faith and fair dealing is implied, that gives bad faith law its predictability. Today’s decision has the potential to significantly expand the circumstances in which bad faith claims may be allowed where none existed before because of the absence of a contract. The majority states in the opinion text accompanying footnote 24 that 'Ttlhe assigned claims plan under JUP creates an insurer-insured relationship, and no underlying contract is necessary to give rise to that relationship and its concomitant rights and obligations because that relationship is created by statute. ’* This is the gravamen underlying the dissent's inability to agree with the majority. Yes, the legislature did magnanimously create a minimum recovery for persons harmed in a motor vehicle accident. However, the dissent is unable to find persuasive evidence that the legislature intended the assigned claimant to have bad faith rights against the servicing carrier. As far as the legislature is concerned, the servicing carrier is doing a public service by participating in the assigned claim program. There is great wisdom and predictability in the law of bad faith that is attached to the singular requirement that an actual contract between the parties exist before good faith duties can be implied. The dissent is concerned that today may mark the demise of that predictability.

. Notwithstanding the foregoing, the court observed in Best Place that "Hawaii might recognize a bad faith cause of action brought by an injured claimant even absent a contractual relationship between the injured claimant and the third-party tortfeasor’s insurance company [,] although this court "expressly decline[d] to rule on the viability of that particular cause of action in this jurisdiction at [that] time.” 82 Hawaii at 125 n. 7, 920 P.2d at 339 n. 7 (emphasis added). The suggestion contained in footnote seven, however, by no means implies that the existence of an insurance contract is not a necessary element of the tort of bad faith settlement practices, a proposition that would render nugatory the analytical underpinning of this court’s adoption of the claim for relief in the first place.
Simmons v. Puu, 105 Hawai'i 112, 120, 94 P.3d 667, 675 (2004)(emphasis in original).

. The majority states:
Enoka's reasoning does not support the proposition that the duty of good faith owed by the insurer to the insured is dependent on the existence of a contract. If the contract is the source of the duty to act in good faith, then mishandling or denying a claim when the insurer has no contractual duty to pay benefits should not give rise to a bad faith claim.... The special relationship between the insurer and the insured and the conduct of the insurer toward the insured is what gives rise to the tort of bad faith, not solely the existence of a contract.
Majority opinion at 491, 304 P.3d at 632, Then at footnote 25, the majority concludes that "Eno-ka is cited for recognizing that an insurer's good faith duty does not rest only in coverage under the insurance policy, but extends to the relationship between insured and insurer.”
The dissent is unable to agree with the majority's reading of Enoka. In Enoka, the plaintiff was injured while she was riding in the bed of a truck that was involved in an accident. Approximately 3 years and 2 months after the accident, Ms. Enoka filed a claim for no-fault benefits under her parents' no-fault policy. Ms. Enoka lived with her parents. The parents' no-fault carrier denied the claim. Ms. Enoka sued the no-fault carrier for no-fault benefits and for bad faith, claiming that the carrier denied her claim on an invalid basis and that it mishandled her claim. The no-fault carrier argued that it cannot be held liable for bad faith if the no-fault claim denial was proper. This court held that Ms. Enoka was not precluded from bringing her bad faith claim against the no-fault carrier even where there is no coverage for liability on the underlying no-fault policy. In other words, this court held that an insured may pursue a claim for bad faith notwithstanding that the underlying insurance claim is denied.
The dissent is not quite clear what the majority was saving in footnote 25. If the majority is addressing the creation of the duty of good faith and fair dealing, then the dissent does disagree. Enoka can only be read that it was the contract of insurance, not the relationship of insurer and insured, that formed the basis upon which to imply the existence of the covenant of good faith and fair dealing. Once the existence of a contract of insurance is identified, a covenant of good faith and fair dealing is implied in said contract. That implied covenant can then give rise to obligations that go beyond the four corners of the insurance contract. For example, a duty not to subordinate the interests of the insured to those of the insurance carrier may not be expressly written in an insurance policy, but may be imposed by the duty of good faith and fair dealing.
However, if footnote 25 was explaining that a bad faith claim can exist in the absence of coverage under the contract, then the dissent is in total agreement with the majority. It is the existence of an insurance contract, not whether there is actual coverage thereunder, that impliedly gives rise to the covenant of good faith and fair dealing.
What Enoka stands for are the following propositions, none of which can be ignored: (1) Ms. Enoka and the insurance carrier had an actual contract of no-fault insurance between them; (2) an insurer-insured relationship was created by that contract of insurance; (3) the insurance contract (not the relationship between insurer and insured) gave rise to an implied covenant of good faith and fair dealing that that formed the legal basis for Ms. Enoka's bad faith claim; (4) the implied covenant required the insurance carrier to deal with Ms. Enoka in good faith and with fair dealings even of her no-fault claim had no basis; and (5) the bad faith claim is independent of the no-fault claim to the extent that the viability of the bad faith claim did not depend upon the viability of the no-fault claim in order to exist.
The duty of good faith and fair dealing is well known to create a wide variety of extra-contractual duties, that relate to many aspects of the insurer-insured relationship. Such extra-contractual duties include how a claim is investigated and adjusted, the timing of what the insurer does, not placing the interests of the insurer over that of the insured, treating the insured fairly, not jeopardizing the insured's personal assets without justification, and many others that are too numerous to mention. The duties involved in Enoka are just one example of extra-contractual duties that are created once a duty of good faith and fair dealing is implied. However, no case in the country, before the case at bar, implied a covenant of good faith and fair dealing without the existence of an actual contract between the parties.

. The majority states in footnote 26 that "the statutes involved in the instant case indicate that an automobile insurance policy should be deemed to exist. ” While this a correct statement with respect to the matter of certificate policies, this is certainly not correct with respect to assigned claims. The fact remains that the legislature did not expressly deem an assigned claim to be based upon an insurance policy. The fact also remains that the legislature did expressly "deem" a certificate policy to be a policy (an insurance contract).

. I am concerned that today’s decision may initiate a march down the proverbial slippery slope that could expose many in statutorily created relationships to bad faith liability. I find it difficult to fathom that the legislature intended, when it created statutory relationships, particularly in the family law area, to subject such individuals and entities to bad faith liability.

. The family law area is teeming with persons and entities who are heavily invested in statutorily created relationships. Some of these may include guardians ad litem, masters, foster parents, adoptive parents, social workers, counselors, and many others. Each of these persons have duties and obligations toward vulnerable or at-risk persons. They may potentially be exposed to bad faith claims because of our decision today. Such exposure to bad faith liability would have a chilling effect upon persons' willingness to serve in these many family law capacities.

. The judicial process simply involves the parties before the court in this single case. The legislative process is much more global in its scope, which offers more notice to a broader segment of our population so that affected persons and organizations can participate in the decision whether to adopt such a novel policy.

. For example: "The certificate shall be deemed a policy for the purposes of this chapter upon the issuance of a valid motor vehicle insurance identification card....” Haw.Rev.Stat. § 431:10C—407(b)(2)(B) (2005 Replacement).

. Such an amendment would neutralize the language of Willis II that interpreted the language prior to the amendment as follows: "Assigned claims are creatures of statute and do not arise out of a contractual relationship.” Willis v. Swain, 113 Hawai'i 246, 249, 151 P.3d at 730 (2006).

. Let there be no mistake that I am certainly not implying or suggesting that servicing carriers routinely conduct themselves in bad faith or that any particular servicing carrier does not conduct itself in good faith and with fair dealing. What I am saying is that the structure and design of the *507 JUP has built in very little business incentive for the servicing carrier to provide optimal service and resources to address assigned claims.